**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Mayo PEREZ et al., Defendants-Appellants.**

**No. 71-1066.**

United States Court of Appeals, Fifth Circuit.

Oct. 25, 1973.

Rehearing and Rehearing En Banc Denied Jan. 2, 1974.

54

James F. Mulla, Jr., New Orleans, La. (court-appointed), for Perez.

Douglass Culp, New Orleans, La. (court-appointed), for Trahan.

John P. Keegan, New Orleans, La. (court-appointed), for Prudhomme.

Milton P. Masinter, New Orleans, La. (court-appointed), for Evans.

F. Irvin Dymond, New Orleans, La., for Perego & Hennigan.

E. Howard McCaleb, III, New Orleans, La., (court-appointed), for DeVille.

Edward M. Baldwin, New Orleans, La., for Shaheen and Ernest C. Hamilton.

Russell J. Schonekas, New Orleans, La., for Tunis & Loridans.

Jerry A. Kirby, Monroe, La., for Loridans.

Dr. Wilson Morris, pro se.

Ernest C. Hamilton, pro se.

Daniel J. Markey, Jr., Asst. U. S. Atty., New Orleans, La., Mark Richard, Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before BROWN, Chief Judge, and GODBOLD and SIMPSON, Circuit Judges.

JOHN R. BROWN, Chief Judge:

The facts of this case, in a purely legalistic sense, need no embellishment in a literary sense to classify this as a piece of prose that could well be called a second "American tragedy." It would be an American tragedy, not only be-

cause the events took place here,[1] but because it is just another instance in which large numbers of Americans get willingly involved in enterprises which reflect a lack of compunction, possibly even a proclivity, to enter into the proverbial "get-rich-quick scheme" evidencing not only a disregard for law but, sadly, also a deafness to conscience. As we undertake our profound but prosaic role of adjudicating these cases, what we see is not pleasant. It reveals a wreckage of promising professional careers, evidence of deliberate and unabashed attempts to prey upon financially pressed expectant mothers for gain and the seemingly all too eager participation by a large cast of characters in a patently illegal undertaking.

## The Scheme

A recital of the facts must precede resolution of the issues raised on appeal. The Louisiana-wide get-rich-quick scheme involved the staging of fraudulent automobile accidents for the purpose of creating false personal injury claims. These claims would be submitted to the insurance carriers for the respective vehicles involved in the wrecks with the aid and contrivance of certain physicians and lawyers.

As the scheme evolved, the participants even coined their own terminology which, though alien to the uninitiated, became known to all those who participated. This glossary of modern day crookedness was quite descriptive. Certain participants were known as "recruiters". The recruiters function, not unnaturally, was to recruit others who assumed titles commensurate with their organizational function. There were the "hitters", whose function it was to drive the "hitter" vehicle in each collision which supposedly was to be liable for causing the accident. Then there was the "target" vehicles. The occupants of the "target" were known as the "driver" and the "riders". It was determined at the outset that pregnant women made exceptionally good riders as they could claim pregnancy related injuries which would be both hard to disprove and easily settleable with the insurance carriers. Throughout the scheme there was an effort made on the part of the participants to use vehicles and drivers which were covered by high limits of liability insurance.

According to a pre-arranged timetable, the "hitter" vehicle would strike the "target" vehicle either broadside or in the rear end. The occupants of the "target" vehicle—the driver and riders—and occasionally some of those in the "hitter" vehicle, feigning injuries, would be sent to a particular doctor and lawyer who would facilitate phony claims by creating a medical history for treatment of non-existent injuries and making a demand on the appropriate insurance company.[2]

The key to immediate financial gain in each staged collision was advances paid by the attorneys to the "riders" for whom allegedly false claims were being submitted. These advances were paid in the form either of cash payments or loans from local financial institutions, co-signed by the attorney handling the claim. Of the usual advance ranging from $250 to $500, part was retained by the rider-claimant with the rest being distributed among the organizers, recruiters, and others who assisted with various aspects of staging the wreck. When the claim was ultimately settled with the insurance carrier, the proceeds would be applied to (i) repay the advancing attorney or in such cases, to liquidate the guaranteed bank loan and (ii) to pay the inflated doctor's bill, not infrequently, with kickbacks going to both the organizers and the participating attorneys in addition to their usual shares.

---

1. This is not to suggest that the events of which we write could not, and possibly have not, happened elsewhere.

2. This was made easy under the Louisiana Direct Action Statute, LRS–R.S. 22:655 (Supp.1962), since claims may be asserted directly without service of process, etc., on the assureds.

The feature of this case which brought it into federal court was that, in the course of asserting and negotiating for settlement the fraudulent claims of the voluntary victims, the United States mails were used. For ease of reference, we have set out a description of the staged collisions for which proof was adduced at trial in Appendix I of this opinion. We have also set out in Appendix II the participants of those staged collisions described in the indictment and proved at trial. Appendix III of this opinion contains the participants of those collisions for which proof was adduced by the government at trial, but which were not described in the indictment.*

### The Proceedings Below

On April 3, 1967, the Grand Jury returned a thirteen-count indictment against the appellants and nine others charging them all with conspiracy to violate the mail fraud statute (18 U.S.C.A. § 371), and selected defendants with the additional offense of violating the mail fraud statute (18 U.S.C.A. § 1341).[3]

### The Result Of The Trial

Following the close of the Government's case, the trial court entered judg-

ments of acquittal as to the defendants, Elda DeMary and Jimmy Vital. [See App. II: (3) and (4)]. Additionally, the trial court dismissed five substantive counts for insufficient evidence.[4] After almost two months of trial, the case against the remaining thirteen defendants was submitted to the jury, and on December 18, 1970, a verdict of guilty was returned as to all defendants except Nolan Breaux, who was acquitted. [See App. II: (7)]. The defendant, Andrew L. Prudhomme, was acquitted on one substantive count but convicted of three other substantive counts as well as the conspiracy count and the defendant, William R. Trahan, was acquitted on two substantive counts but convicted of another substantive count in which he was charged as well as the conspiracy count. Subsequent to the trial, the trial court entered an order dismissing the indictment as to the defendants, Walter Borsch and Roosevelt Prater. For ease of reference we have set out in appendix V the sentences imposed by the District Court for each of the counts under which the appellants were convicted below. The record before us on appeal numbers upwards from 10,000 pages

---

* To facilitate discussion, reference will be made to these appendices and specific subdivisions thereof as follows: e. g., [App. I: (3) indicates Appendix I with specific reference to the January 4, 1966 accident staged in Lake Charles, Louisiana.]

3. Numerous pre-trial motions were filed by appellants including motions to sever counts of the indictment, motions for severance of defendants, motions to dismiss the indictment, motions for discovery and bills of particulars, motions for change of venue, motions to suppress, motions for changes of attorneys, and motions pertaining to bonds and bond forfeitures [see App. IV]. Throughout the trial motions for severance, for mistrial and directed verdicts were reurged by appellants based on grounds of misjoinder and multiplicity of conspiracies as argued in the pre-trial motions. Prior to trial three defendants, Larry Dale DeMary, Kenneth Richard DeMary and Charles Leon Winn, pleaded guilty to various counts of the indictment. The defendant, Earl DeMary, was severed prior to trial because of poor health

resulting in his incapacity to stand trial. The trial of the defendant, Roosevelt Prater, also was severed when he failed to appear for trial on October 26, 1970. During the course of the trial, the defendant, Walter Borsch, was severed following an airplane accident in which he was injured.

4. The substantive counts dismissed by the Court were those numbered I through IV in the indictment and that numbered VII. Counts I through IV all dealt with an accident staged on January 5, 1966 at Lake Charles. [See App. I: (4)]. It was dismissed because, in the considered judgment of the trial court, the evidence adduced was insufficient to establish that the accident and its participants were a part of the general scheme and conspiracy but more likely tended to show a separate scheme. Count VII, which involved the illegal mailing of a letter arising out of the June 29, 1966 staged collision [App. I: (12)], was dismissed on the basis that the Court considered the evidence insufficient to take the count to the jury.

contained in thirty-eight bulging volumes including the exhibits.[5]

### Multi-Party—Multi-Attacks

Each of the twelve who were convicted, all appellants here, alleges prejudicial error was committed below entitling him to reversal. The various grounds asserted are (i) variance between the indictment and the proof, (ii) misjoinder of offenses and denial of severance, (iii) inadequate and prejudicial instruction by the court, (iv) denial of motions for a bill of particulars, (v) lack of a speedy trial and (vi) insufficiency of the evidence. These contentions will be taken up separately in the order recited here.[6]

### Single Or Multiple Conspiracies

All appellants assert that a variance existed between the indictment charging a single conspiracy involving multiple defendants and the proof which, at best they claim, revealed plural conspiracies involving multiple parties which, admittedly, overlapped upon one another in personnel.

██ The necessity for distinguishing between evidence which tends to show a single overall conspiracy and that which tends to show several separate conspiracies, a frustrating and challenging task indeed, has been faced by this court before. United States v. Morado, 5 Cir., 1972, 454 F.2d 167; United States v. Lloyd, 5 Cir., 1970, 425 F.2d 711; Jolley v. United States, 5 Cir., 1956, 232 F.2d 83; Brooks v. United States, 5 Cir., 1947, 164 F.2d 142; United States v. Cruz, 5 Cir., 1973, 478 F.2d 408. The necessity for drawing this distinction derives from our interest, clearly our duty, in jealously protecting those accused from the possible transference of guilt of others accused, at least in the eyes and minds of a jury, which so often is claimed to be encountered where en masse prosecutions are undertaken for a conglomeration of separate offenses. The object of such an inquiry must be, in the first instance, to ascertain whether (i) such a variance between the indictment and the proof actually exists and, if it does, (ii) to determine whether substantial rights of an accused are in fact affected by the variance. United States v. Morado, *supra*, 454 F.2d at 170. To conclude in the negative on element (i), of course, would obviate inquiry on (ii).

Here, the thirteen-count indictment was so structured that counts I through XII alleged specific substantive violations of the mail fraud statute against certain of the appellants while count XIII charged all of the appellants with conspiring to violate the mail fraud statute. Count XIII set forth 22 overt acts as being committed in furtherance of the alleged conspiracy in addition to mailings enumerated in counts I through XII which it incorporated by reference. Count XIII also incorporated by reference the provisions of count I which specifically delineated the particular functional responsibilities of the recruiters, attorneys, and the physicians in furtherance of the scheme.

There were twenty-one persons named as defendants in the indictment, of which fifteen were tried. (See note 3, *supra*). Upon entering pleas of guilty, the defendants Larry Dale DeMary, Kenneth Richard DeMary, and Charles Leon Winn became key witnesses for the government. In addition to the testimony of these three defendants who had pleaded guilty, the bulk of the government's evidence as to the actual planning and execution of the accidents came from thirty-three other witnesses, most of whom admitted complicity in the staging of the collisions which were the objects of their testimony.

---

5. The trial transcript occupied twenty-two volumes and numbered 5,591 pages with the exhibits comprising the remaining sixteen volumes.

6. Treated also at points thought appropriate throughout the opinion, are assignments of error asserted by one or more of the appellants which do not necessarily lend themselves to classification within the above categories.

The theory of the government's case, as expressed in count XIII of the indictment, was that all defendants were co-conspirators in a single common scheme to cause the mails to be used in furtherance of a scheme or artifice to defraud insurance companies through the staging of automobile collisions prior to January 1, 1967 and continuously thereafter until the date of the return of the indictment. Kenneth DeMary testified that he was approached in October of 1965 by his friend and former employee Mayo Perez, with the idea of making "fast money" by staging fraudulent automobile collisions and collecting from the insurance carriers for alleged damages suffered. This testimony indicated that it was Kenneth's acquaintance with various attorneys around the state of Louisiana with whom he could arrange the handling of fraudulent claims which induced Perez to seek his participation. Larry DeMary testified that shortly thereafter his brother Kenneth DeMary and Mayo Perez came to him and asked that he join them in the proposed scheme. When he agreed, the trio staged the first of a long series of fraudulent collisions near Bossier City, Louisiana on November 3, 1965. [See App. I: (1); App. II: (1)].

### Hub—Spokes—Wheel?

With the law's sometime misleading quest for manageable analogy, the government contends that the agreement reached between Kenneth DeMary, Larry DeMary and Mayo Perez constituted them as the "hub" members of a conspiracy which remained operative for many months thereafter until the return of the indictment. The structure of the conspiracy charged, if portrayed schematically, would resemble a "wheel".[7] At the "hub" of the wheel would be the three initial conspirators.[8] The "spokes" would be the participants of the individual staged accidents proved. The government maintains that the lawyers, doctors, recruiters, and passengers who comprised these "spokes" would, at times, enter the conspiracy by participating in an accident as initially planned and expected, thereby adopting the common objective of the conspiracy as their own. Each spoke, under the government's theory, thus, was engaged in a similar relationship with one or more of the hub figures.

### If Not A Spoke—Hub—Wheel, A Chain

Structural analysis can be carried a step further, by viewing each individual spoke as a "chain" type of conspiracy (see note 7, *supra*). The "chain" conspiracy is characterized by different activities carried on with regard to the same subject such that each conspirator, in a chain-like manner, performs a separate function which serves as a step or phase in the accomplishment of the overall contrivance. Here the end product in each chain was the defrauding of insurance companies through the creation of false personal injury claims with a resultant use of the mails. Viewed strictly in terms of their degree of involvement,[9] from the periphery of the wheel inward to the "hub", the "chain" or "spoke" participants would appear in the order of rider—driver (of target)—hitter — recruiter[s] — doctor[s]—lawyer[s]—hub figure[s].

7. See, Note, Federal Treatment of Multiple Conspiracies, 57 Columbia Law Review 387, which distinguishes the "wheel" type conspiracy from the "chain" type.

8. The principal "hub" figures here would be Kenneth and Larry DeMary. Mayo Perez would be a lesser "hub" figure since he participated in fewer of the accidents. At the trial the government also attempted to establish Earl DeMary as a "hub" figure for his part in organizing the January 5 accident but the trial court struck the counts of the indictment relating to this accident on grounds that it probably was a separate and distinct conspiracy and, as such, not a part of the overall conspiracy. [See App. I (4); App. II: (3)].

9. Here we view the spoke participants in terms of their degree of involvement rather than necessarily viewing them according to the succession of functions or steps performed as previously discussed under the section of this opinion headed "The Scheme".

*What Appellants Accept*

Appellants, with regard to the staging of each individual wreck, do not vigorously argue that knowledge and awareness of one conspirator, relative to the existence and general activities of the other conspirators, could not have been inferred. Using the test of United States v. Bruno, 2 Cir., 1938, 105 F.2d 921, each conspirator, once he knew he was to be involved in a staged collision, should have been aware of the others.[10] As such, the riders must have known that their phony claims were processed by insurance companies. Likewise, to each participant in the chain, the knowledge can be inferred that much more was required to complete the overall goal of obtaining funds on false pretenses than the sole function that they were performing. Thus appellants do not contend that the finding of a "chain" conspiracy as to each alleged auto wreck could not be properly reached by a jury. Nor do appellants contend that the jury could not properly find that perhaps some of these individual chain conspiracies were connected since the participants overlapped to a degree and the activities performed were similar. It has been held that where the additional element of overlapping membership exists, there is considerable authority that a single overall conspiracy may be found,

United States v. Morado, *supra,* and that there is sufficient evidence to allow the jury to consider the issue of whether there was a single conspiracy, or multiple conspiracies. Jolley v. United States, 5 Cir., 1956, 232 F.2d 83.

*Not One, But Many Wheels—Or A Wheel Without A Rim*

Though conceding an occasional overlapping of membership between the several spokes, appellants argue that here there existed several separate conspiracies. Appellants contend that subsequent to the first collision collaborated on between Kenneth and Larry DeMary in Bossier City on November 3, 1965, the two brothers proceeded to set up separate and distinct operations with no control exerted by either over the other's sphere of operation. Likewise they argue that Mayo Perez, also one of the initial collaborators, became the "hub" figure in another separate and distinct conspiracy. Again employing a structural analysis, appellants strenuously argue that the "wheel" which the government attempted to prove was deficient in that it lacked a "rim" of connexity. Absent, they contend, was a common objective and awareness of the other "spokes" existence which acts to bind the spokes together into one overall conspiracy.[11] As supportive of their proposition, appellants point to the trial

10. In *Bruno,* narcotics were smuggled into New York and ultimately sold in Texas and Louisiana as well as in New York. Four independent groups were involved: the smugglers, the middlemen, and two groups of retailers. The importers' hope of profitable sale was dependent on the existence of a selling outlet. Similarly, the retailers could not stay in business without a continuing source of supply. The Court held that the conspirators at one end of the chain knew that the unlawful business would not, and could not, stop with their buyers; and those at the other end knew it had not begun with their sellers. Thus, in a "chain" conspiracy prosecution, the requisite element—knowledge of the existence of remote links—may be inferred solely from the nature of the enterprise.

11. The importance in a wheel type conspiracy of such knowledge by individual spokes of the existence of other spokes was emphasized in Federal Treatment of Multiple Conspiracies, *supra* at 388–393. As there articulated, the test seems to be one of "interdependence." As there pointed out, although this test can be applied to the functional levels of a "chain" conspiracy with relative ease (see note 10, *supra*), its application to the spokes in a "wheel" conspiracy depends on whether the combined efforts of the spokes, as with the functions in a "chain", are required to insure the success of the venture.

As for us, the problem is difficult enough without trying to compress it into figurative analogies. Conspiracies are as complex as the versatility of human nature and federal protection against them is not to be measured by spokes, hubs, wheels, rims, chains, or any one or all of today's galaxy of mechanical molecular or atomic forms.

court's dismissal of counts I through IV of the indictment which were based on the January 5, 1966 collision which the trial Judge viewed as a separate and distinct conspiracy (see footnote 4, *supra*) [App. I: (4)]. Appellants contend that, just as the trial court disallowed the January 5, 1966 accident to be grouped by the government within an overall conspiracy in count XIII of the indictment, it should have further disallowed the grouping of the separate operations of Kenneth and Larry DeMary under the heading of one overall conspiracy.

In asserting that a variance between the indictment and the proof here existed, and furthermore, that it is fatal, appellants primarily rely on the Supreme Court's decision in Kotteakos v. United States, 1946, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557. In that case, one where the indictment charged but one overall conspiracy, the government's proof at trial, by its own admission, showed that there were eight separate conspiracies involving some thirty-two persons. The key figure in the scheme, which involved the obtaining of government loans by making fraudulent representations, was a man named Brown, who was a part of, and directed each of the eight conspiracies. Brown was the only element common to the eight other-wise completely separate undertakings, no other person taking part in, nor having knowledge of the other conspiracies. Though each of the conspiracies had similar illegal objects, none depended upon, was aided by, or had any interest in the success of the others.[12] The Supreme Court, in reversing the convictions, refused to apply the *Berger* rule [13] to these facts, but it nevertheless explicitly declined to overrule Berger's application of the "harmless error" rule where substantial rights of the accused are not affected. While the Court was emphatic in pointing out the necessity of particularized case-by-case treatment of the materiality of a variance, the opinion demonstrates a shift in orientation from Berger's reliance on the criteria of surprise and double jeopardy to the also important factor of transference of prejudicial evidence, subconsciously or otherwise, from one defendant to others. In weighing carefully this additional factor the Court clearly expressed its unwillingness to mechanically apply the "harmless error rule" where a variance has resulted in improperly admitting extra judicial statements of a co-defendant against an appellant or exposing him to the harm flowing from a mass of evidence implicating others but not necessarily him on the erroneous assumption that the two were co-conspirators.[14]

12. The only connection between the separate conspiracies was that each group had dealt independently with Brown as their agent, 328 U.S. at 753, 754, 66 S.Ct. at 1243.

13. In the Circuit Court the invocation of the Berger rule had been held sufficient to uphold the verdict. United States v. Lekacos, 2 Cir., 1945, 151 F.2d 170.

The Berger rule arose from Berger v. United States, 1935, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314. There, the trial court charged that if the jury were to find the defendants guilty of conspiracy, it could only be the single conspiracy alleged in the indictment. Although the Supreme Court found that two conspiracies, only one of which involved the defendant, had been shown, it affirmed his conviction, refusing to follow an earlier line of Court of Appeals decisions which had held that a variance as to the number of conspiracies was an automatic ground for reversal. The Court stated that such a variance was harmless error unless the defendant's "substantial rights" had been prejudiced. Two criteria for determining prejudice were whether the defendant had been sufficiently protected against surprise and whether the variance left him vulnerable to a later prosecution because of failure to make clear the offense for which he had been tried. The Court stated that an indictment could have alleged that all defendants were members of two conspiracies, identical but for their objects. In such a case, the Court reasoned, Berger could not have been prejudiced by the admission against him of evidence relating to both conspiracies if he was acquitted of one of them. Since the actual case differed only in form, the Court held that Berger's substantial rights were unimpaired.

14. Appellants also cite Barnard v. United States, 9 Cir., 1965, 342 F.2d 309, United States v. Varelli, 7 Cir., 1969, 407 F.2d 735,

We are unpersuaded that anything resembling the impairment of substantial rights so evident in *Kotteakos, supra,* took place here. A review of the record has convinced us that the evidence adduced, both direct and circumstantial, was adequate to warrant the inference that all the participants had entered into this concerted program. To conspire is to agree—the presence of an agreement is the primary requirement for the establishment of a conspiracy, the commission of an overt act in furtherance being attendant. Clark v. United States, 5 Cir., 1954, 213 F.2d 63; Schnautz v. United States, 5 Cir., 1959, 263 F.2d 525, cert. denied, 1959, 360 U.S. 910, 79 S.Ct. 1294, 3 L.Ed.2d 1260; Hunnicutt v. United States, 5 Cir., 1945, 149 F.2d 888, cert. denied, 1945, 326 U.S. 757, 66 S.Ct. 99, 90 L.Ed. 455; United States v. Fischetti, 5 Cir., 1971, 450 F.2d 34, cert. denied, 1972, 405 U.S. 1016, 92 S.Ct. 1290, 31 L.Ed.2d 478; United States v. Jacobs, 5 Cir., 1971, 451 F.2d 530, cert. denied, 1972, 405 U.S. 955, 92 S.Ct. 1170, 31 L.Ed.2d 231; Roberts v. United States, 5 Cir., 1969, 416 F.2d 1216; Castro v. United States, 5 Cir., 1961, 296 F.2d 540; United States v. Warner, 5 Cir., 1971, 441 F.2d 821, cert. denied, 1971, 404 U.S. 829, 92 S.Ct. 65, 30 L. Ed.2d 58; Nelson v. United States, 5 Cir., 1969, 415 F.2d 483, cert. denied, 1970, 396 U.S. 1060, 90 S.Ct. 751, 24 L. Ed.2d 754. Since conspiracy is a crime which by its nature tends to be secret, the agreement is seldom susceptible of direct proof. See, e. g., Krulewitch v. United States, 1949, 336 U.S. 440, 69 S. Ct. 716, 93 L.Ed. 790; Marrash v. United States, 2 Cir., 1909, 168 F. 225, 229. Thus, the existence of a conspiracy is usually proved in one or more of three ways—by circumstantial evidence, by the testimony of a co-conspirator who has turned state's evidence,[15] or by evidence of out-of-court declarations or acts of a co-conspirator [16] or of the defendant himself. If the totality of these types of evidence is adequate to show a concert of action, all the parties working together understandingly, with a single design for the accomplishment of a common purpose then the conspiracy may be found. Fowler v. United States, CCA9, 273 F. 15; United States v. Varelli, 7 Cir., 1969, 407 F.2d 735. This is not to be confused with situations where sepa-

Rocha v. United States, 9 Cir., 1961, 288 F.2d 545, and United States v. Goss, 4 Cir., 1964, 329 F.2d 180 in support of their contention that a variance between the indictment and the proof here existed warranting our reversal. Two of these cited cases merit further discussion.

In *Barnard, supra,* the indictment charged 28 defendants with conspiring to defraud various insurance companies by staging five automobile accidents and claiming damages for personal injuries in connection with them. The Ninth Circuit found that 22 defendants were connected with only one collision, three were connected with two collisions, and one was connected with three collisions. Only the defendant Barnard was involved in, and in fact planned, all five accidents. The Court reversed the convictions under the conspiracy count, stating that each accident was planned separately and that no evidence was presented which showed that the planning of each accident contemplated more than that particular one.

In United States v. Varelli, *supra,* the Seventh Circuit reversed convictions for conspiring to commit various truck hijacking offenses. The Court held that "while the hijackings were sufficiently related to allow all the defendants to be tried together, there was not sufficient evidence from which it could be concluded that there was one overall conspiracy." Here, as in *Kotteakos, supra,* the Court was concerned with the transference of guilt between those accused, but not really co-conspirators.

15. The testimony of a co-conspirator as to facts within his knowledge involves no hearsay · problem, since the statements are given on the stand and are open to cross-examination.

16. The general rule with regard to the admission of hearsay evidence as to the statements of a co-conspirator may be stated—any act or declaration by one co-conspirator committed in furtherance of the conspiracy and during its pendency, is admissible against each co-conspirator provided that a foundation for its admission is laid by independent proof of the conspiracy.

rate conspiracies exist and certain parties are common to each.[17]

■ "Every agreement has two dimensions: the persons privy thereto, and the objectives encompassed therein." Note, Federal Treatment of Multiple Conspiracies, *supra*. With respect to the first dimension there is no requirement that every defendant must participate in every transaction in order to find a single conspiracy. While the conspiracy may have a small group of core conspirators, other parties who knowingly participate with these core conspirators and others to achieve a common goal may be members of an overall conspiracy. With respect to the objectives of the conspiracy, it can be said that the prohibited activity must be committed in furtherance of a common objective. Implicit within this second dimension, though, is the requisite that, not only must the objectives of all charged under one conspiracy be common, but there must be one objective, or set of objectives, or an overall objective to be achieved by multiple actions.[18]

■ In essence, the question is what is the nature of the agreement. If there is one overall agreement among the various parties to perform different functions in order to carry out the objectives of the conspiracy, then it is one conspiracy. United States v. Varelli, *supra*. If that agreement contemplates bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators to keep it up, then such agreement constitutes a single conspiracy. United States v. Palermo, 7 Cir., 1969, 410 F.2d 468, 470. And the same is true as to an agreement that contemplates that the activity will be repeated sometimes with, sometimes not, the same actors.

Here, there was direct, positive testimony, if credited, from which the jury could find that each of the defendants, appellants here, were participants in one overall conspiracy. With hardly any exception, the testimony squared with the common sense of the scheme. The dictates of self-preservation and longevity necessitated that the scheme rapidly expand beyond the relatively small geographical area represented by Lake Charles, Louisiana and its environs. Hence the alleged separate operations of Kenneth and Larry DeMary in different areas of the state.[19] As the geographical

---

17. As was the case in Kotteakos v. United States, *supra*, Barnard v. United States, *supra*, and United States v. Varelli, *supra*.

18. While this sounds like an exercise in semantics, the Supreme Court in *Kotteakos*, *supra*, concluded that while each of the eight separate schemes proved had as its objective the obtaining of fraudulent loans, each scheme to obtain a loan was an end in itself, and thus arose from a separate agreement.

19. Testimony at trial revealed that Larry DeMary had a hand in planning and staging approximately 10 fraudulent collisions. [See e. g. App. I: (1), (3), (5), (9), (11), (12), (13), (15); App. II: (1), (4), (6), (7), (8), (9); App. III: (1), (4)]. Kenneth DeMary, on the other hand, planned and staged approximately 25 or 30 fraudulent collisions. [See e. g. App. I: (1), (5), (6), (7), (8), (9), (10), (12), (15); App. II: (1), (4), (5), (7); App. III: (2), (3), (4), (5), (6)]. Of the total, there is evidence that at least four staged collisions were jointly planned and organized by the two brothers. [See e. g. App. I: (1), (5), (9), (12); App. II: (1), (4), (8); App. III: (4)].

Appellants argue that subsequent to the first staged collision jointly planned by the brothers in Bossier City, Louisiana on November 3, 1965 [App. I: (1)], they proceeded to dissolve any common plan, which arguably may have existed between them, and set up separate operations. They contend that Larry began staging accidents in the Lake Charles area, while Kenneth pursued a similar, but separate, course in other areas of the state, primarily the northern part of Louisiana in and around Shreveport. While there is some indication that the brothers concentrated the bulk of their activities with some regard for geographical separation, we are convinced that the jury could conclude that the totality of their activities remained one overall conspiracy. We are aided in arriving at this conclusion, among other things, by the evidence that, subsequent to the November 3, 1965 collision, the DeMary brothers collaborated together on at least three more staged collisions. These occurred on January 6, April 25, and June 29 of 1966.

area increased, it became necessary to vary the pattern of doctors and lawyers on each individual collision.[20] Avoidance of detection also necessitated constant changing of passengers and claimants.[21] There was evidence, direct and circumstantial, that the DeMary brothers were in constant communication throughout the life of the scheme.

That here we have a single scheme which envisioned a series of staged collisions, rather than it being a series of "one shot" efforts, is evident by examining the sources of profitability for the convicted participants. The DeMary brothers and the convicted professionals, as well as the recruiters, could only benefit by direct participation in repeated staged collisions.[22] Each participated in as many of the staged collisions as prudence dictated.[23] This was the only way to make the scheme pay for these active participants and, as such, it can be said that the scheme inherently envisioned multiple collisions.

Not insignificant in pointing out the unitary nature of the scheme were the facts surrounding the collision staged on March 28, 1966 in Shreveport. [See App. I: (8); App. III: (3)]. Here, reimbursement of advances made by the appellant attorneys prior to learning of the non-existence of an insurance policy under which to make claims was contingent upon future staged collisions. There was testimony that these advances were subsequently repaid in this manner.

The record reflects careful planning and cooperation on the part of each of the persons involved in the conspiracy. We agree with the Seventh Circuit in United States v. Palermo, *supra* at 470, where they wrote that—it would be "a perversion of natural thought and of natural language to call such continuous co-operation a cinematographic series of distinct conspiracies, rather than to call it a single one." In any event, in an instance such as the one presented by this case, with overlapping membership and activities all directed toward a common goal, most courts have found, as we do here, sufficient evidence to uphold a jury verdict reflecting a single conspiracy. United States v. Cruz, *supra*; United States v. Lloyd, *supra*; United States v. Nasse, 7 Cir. 1970, 432 F.2d 1293; United States v. Borelli, 2 Cir., 1964, 336 F.2d 376; United States v. Morado, *supra*.

### Non Spokes, Non Hubs, Non Rings, Non Wheels, Non Chains Should Stop The Law In Its Appointed Rounds

This thing seems terribly complex but it really is not. The scheme simply

[See App. I: (5), (9), (12); App. II: (4), (7); App. III: (4)].

20. The varying pattern of participation in the proved collisions by the appellant professionals also detracts heavily from the separate conspiracy argument advanced by appellants. An indication of this variation occurred in the May 25, 1966 staged collision organized by Kenneth DeMary in Shreveport where appellant attorneys Shaheen and Hennigan of Lake Charles represented the claimants from the "target" vehicle. [See App. I: (10); App. III: (5)].

21. No two staged collisions involved identical personnel although there was considerable overlapping of personnel between staged collisions.

22. In an attempt to show the existence of multiple conspiracies appellants argue that each participant only benefitted personally from the staged accidents in which he performed some function. While this is true, we do not think it exculpates any of those who were convicted. Although several of the appellants here at times served in the dual capacity of "rider," a role which might be characterized as passive—but still illegal —each did more. Each also handled an active role. Whether an organizer, hitter, rider, driver, recruiter, or professional, their roles actively furthered the scheme to defraud the insurance companies, and we think they were properly subject to being charged under one overall conspiracy. Not only was there ample evidence from which the jury could find that they performed the various functions charged, but there was likewise such evidence that they performed them on repeated occasions.

23. Caution demanded that the conspirators avoid leaving a "trail" of identical doctors and lawyers.

would not have gotten off the ground—involving, as it did, the professional people of doctors and lawyers as the key to ultimate success—were this to be a one shot operation. For rewards high enough to compensate for the awesome risks of loss of professional status, the ring leaders knew that there had to be a series of phony accidents. Nor were the riders, drivers, targets or hitters unaware of this. All knew that each occurrence was but a part of a plan by which phony accidents would be staged, necessarily at times and intervals, temporally and geographically separated to allay intense suspicions. Even the most innocuous of "riders"—indeed even a pregnant one—was aware in the execution of his/her part that the enterprise was a crooked one in which each stood to gain.

From an operational sense this was not a series of little concoctions to set up a particular collision. It was rather a grand scheme for all to obtain some reward for his/her participation each according to the part played and the risk undertaken.

It only confounds the law to try to characterize this in the figure of spokes, wheels, hubs, rims or chains. (See note 11, *supra*). It was one big, and hopefully profitable enterprise, which looked toward successful frequent but none-the-less discreet repetitions, and in which each participant was neither innocent nor unrewarded.

### Joinder and Severance Adequacy Of Instruction

■ In contentions closely related to those alleging prejudicial variance between the indictment and the proof, appellants argue that their initial joinder in the same indictment and subsequent joinder for trial were improper. These contentions are without merit. Dealing first with the joinder under one indictment, F.R.Crim.P. 8(b), allows defendants to be joined in a single indictment and trial together if "they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Once these conditions are satisfied, as clearly they were here, it is "within the sound discretion of the trial judge as to whether the defendants should be tried together or severally." [24] Opper v. United States, 1954, 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101, 109; United States v. Lane, 5 Cir., 1972, 465 F.2d 408, 413; Tillman v. United States, 5 Cir., 1968, 406 F.2d 930, vacated in part, 1969, 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742.

Appellants contend, as we understand it, that, even if one conspiracy was shown as we have held and joinder was thereby proper under F.R.Crim.P. 8, the complexity of the evidence coupled with the absence of adequate instruction by the Court to the jury to aid them in the process of receiving and assimilating it rendered denial of their motions for severance under F.R.Crim.P. 14, an abuse of discretion.

■ Whenever a crime involves more than one actor, there arises a need to balance the interests of the government in trial economy and in presenting at one time the whole of an illegal operation on the one hand against the need for protecting the rights of the individual defendant on the other. Since conspiracy necessarily involves an agreement between two or more parties and so much can come in once the agreement is established the courts have to be conscious of the dangers well summarized

24. F.R.Crim.P. 14 provides as follows:
"If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial."

by Mr. Justice Rutledge, writing for the Court in Kotteakos v. United States, *supra*.

"There are times when of necessity, because of the nature and scope of the particular federations, large numbers of persons taking part must be tried together or perhaps not at all, at any rate as respects some. When many conspire, they invite mass trial by their conduct. Even so, the proceedings are exceptional to our tradition and call for use of every safeguard to individualize each defendant in his relation to the mass."

328 U.S. at 773, 66 S.Ct. at 1252, 90 L. Ed. at 1571. The rules are liberal in permitting joinder at trial, both of offenses [25] and of defendants.[26] Although this permits wide latitude on the prosecution in determining the form in which the case is to be prosecuted the trial court has both the duty and the authority to order a severance at any time during the trial if it believes that impermissible prejudice would otherwise result.[27] Thus, the serious problem of reconciling the sometimes competing interests of trial economy and danger of prejudice to defendants necessarily resides in the discretion of the trial Judge. Motions for severance under Rule 14 have rarely been granted and the trial court's decision has not been disturbed absent a clear showing of abuse. Opper v. United States, 1954, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101; Smith v. United States, 5 Cir., 1967, 385 F.2d 34. The general rule has been, and remains, that persons jointly indicted should be tried together, especially in conspiracy cases. Hall v. United States, 1948, 83 U.S.App.D.C. 166, 168 F.2d 161, cert. denied, 1948, 334 U.S. 853, 68 S.Ct. 1509, 92 L.Ed. 1775; Davenport v. United States, 9 Cir., 1958, 260 F.2d 591; United States v. Kahaner, S.D.N.Y., 1962, 203 F.Supp. 78; Milam v. United States, 5 Cir., 1963, 322 F.2d 104.

To obtain a severance under Rule 14, the movants have the burden of convincing the Court that without such drastic relief they will be unable to obtain a fair trial. United States v. Haim, S.D.N.Y., 1963, 218 F.Supp. 922. A mere showing of some prejudice has usually been insufficient, for qualitatively it must be the most *compelling* prejudice against which the trial court will be unable to afford protection. Tillman v. United States, 5 Cir., 1968, 406 F.2d 930, rehearing en banc denied, 1969; Williamson v. United States, 9 Cir., 1962, 310 F.2d 192; United States v. Lev, S.D.N.Y., 1958, 22 F.R.D. 490.

The year following the *Kotteakos* decision, *supra*, the Supreme Court in Blumenthal v. United States, 1947, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 found that a single conspiracy existed where five co-conspirators were involved in selling whiskey at over-ceiling prices to retailers. Though the trial court in *Blumenthal* had found that the evidence adduced established the existence of one overall conspiracy, certain admissions of two of the co-conspirators were excluded as evidence against three of the other defendants on trial.[28] The jury was

---

25. F.R.Crim.P. 8(a) provides:

Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

26. F.R.Crim.P. 8(b), *supra*.

27. See note 24, *supra*.

28. In articulating the grounds of excluding these admissions as evidence against three of the co-conspirators the trial court stated:

"Where the existence of a criminal conspiracy has been shown, every act or declaration of each member of such conspiracy, done or made thereafter pursuant to the concerted plan and in furtherance of the common object, is considered the act and declaration of all the conspirators, and is evidence against each of them. On the other hand, after a conspiracy has come to an end, either by the accomplishment of the common design, or by the

specifically instructed to disregard that evidence in considering the evidence against any defendant other than the two who made the admissions. Responding to the contentions on appeal that the safeguards implemented by the trial court were inadequate, the Supreme Court wrote:

"The grave danger in this case, if any, arose not from the trial court's rulings upon admissibility or from its instructions to the jury. * * * The danger rested * * * in the risk that the jury, in disregard of the court's direction, would transfer, consciously or unconsciously, the effect of the excluded admissions from the case as made against Goldsmith and Weiss across the barrier of the exclusion to the other three defendants."

332 U.S. at 559, 68 S.Ct. at 257, 92 L. Ed. at 169. The Supreme Court there went on to list three safeguards—each of which was satisfied—which must be accorded in a mass trial: (i) clear rulings on admissibility, (ii) limitations of the bearing of evidence as against particular individuals, and (iii) adequate instructions. The Court emphasized that these are "extremely important * * * safeguards [which must] be made as impregnable as possible." 332

U.S. at 559–560, 68 S.Ct. at 257, 92 L. Ed. at 169.

In addition to instructing the jury that "the guilt or innocence of each defendant must be determined by the jury separately [and that] each defendant has the same right to that kind of consideration on your part as though he were being tried alone," [29] the *Blumenthal* trial court, shortly after the trial began, announced that all evidence was to be received initially only as against the particular defendant or defendants to whom it appeared expressly related. The Court reserved to the government, however, the right to move for its admission as against any or all of the other defendants when in the government's opinion sufficient facts had been introduced to show such defendants to have been connected with the conspiracy charged. Ultimately, the government so moved and the Court at that time excluded the admissions against all except those two co-conspirators against whom it was initially admitted.

Though appellants concede that the trial court here did give the jury an instruction similar to that given in *Blumenthal, supra* (see note 29, *supra*) admonishing it to consider the evidence against each defendant separately, they

parties abandoning the same, evidence of acts or declarations thereafter made by any of the conspirators can be considered only as against the person doing such acts or making such statements."
332 U.S. at 552, note 10, 68 S.Ct. at 254, note 10, 92 L.Ed. at 165, note 10.
In the present case we have concluded that, as was concluded in *Blumenthal, supra,* the evidence was such that a jury could find the existence of one overall conspiracy, but here we have no such post-termination of the conspiracy admissions.

29. Similar instructions were given by the Court to the jury in the present case.
The Court stated:
Each of the defendants charged in each count is entitled to your separate consideration as to whether he is guilty or innocent as to that count.
Each count and the guilt or innocence of each defendant with respect thereto must

be considered by you separately and independently of another count and another defendant.
The defendants, though being tried together, are each entitled to the same kind of consideration on your part as if he were being tried alone. You may not assume that all are either guilty or not guilty simply because they are tried together. It is your duty to give separate, personal consideration to the case of each individual defendant.
When you do so, you should analyze what the evidence in the case shows with respect to that individual, leaving out of consideration entirely any evidence admitted solely against some other defendant or defendants. Each defendant is entitled to have his case determined from evidence as to his own acts and statements and conduct, and any other evidence in the case which may be applicable to him.

contend that the absence of clear rulings on admissibility at the inception of the trial to aid the jury in the process of receiving and assimilating the evidence was prejudicial. We disagree.

 Here in addition to the trial court admonishing the jury that they must consider the guilt or innocence of each defendant separately and independently (see note 29, *supra*), the Court, in the course of its instruction to the jury, further admonished that the jury should acquit if it should find that multiple conspiracies existed. The Court then, to our satisfaction, proceeded to inform the jury what it must determine in order to find the existence of one overall conspiracy.[30] The absence here of admissions such as those in *Blumenthal, supra,* which were admissible only against some, but not all, of the defendants renders, in our opinion, the safeguards implemented by the trial court adequate to protect the individual rights of each defendant.

 It is further asserted by some appellants that the criminal records of their co-defendants below were prejudicial to their defense and should have been sufficient to warrant a severance. Similar grounds have generally been rejected. United States v. Fradkin, 2 Cir., 1935, 81 F.2d 56; United States v. Barber, D.C.Del., 1969, 296 F.Supp. 795; United States v. Margeson, E.D.Pa., 1966, 261 F.Supp. 628; United States v. Bentvena, S.D.N.Y., 1960, 193 F.Supp. 485. These grounds have been held insufficient even if the prior convictions were for similar offenses. United States v. Hanlin, D.C. Mo., 1962, 29 F.R.D. 481; Joint and Single Trials Under Rules 8 and 14 of the Federal Rules of Criminal Procedure, 74

Yale L.J. 553 (1965). Some appellants assert that the failure of each and every defendant to be named in all substantive counts of the indictment warranted a severance. Such, however, is not the rule. United States v. Bentvena, *supra;* Chadwick v. United States, 5 Cir., 1941, 117 F.2d 902, cert. denied, 1941, 313 U. S. 585, 61 S.Ct. 1109, 85 L.Ed. 1541. This is especially true in cases, such as the present one, where the evidence relied upon to establish the conspiracy embraces the substantive counts of the indictment. United States v. Nomura Trading Co., S.D.N.Y., 1963, 213 F. Supp. 704. We further reject some of the appellants' contentions that a joint trial would necessarily restrict their attorney's control of the defense to their prejudice. That defendants might have a better chance of acquittal if tried separately does not establish their right to a severance under Rule 14. Robinson v. United States, C.A.D.C., 1954, 93 U.S. App.D.C. 347, 210 F.2d 29; United States v. Clark, 5 Cir., 1973, 480 F.2d 1249.

### Proffer of Grand Jury Testimony

Appellant Prudhomme contends that his inability to introduce into evidence certain portions of appellant DeVille's Grand Jury testimony coupled with the unavailability of co-defendant DeVille to serve as a witness for his defense[31] denied him a fair trial. Appellant Prudhomme was initially charged in substantive counts 5, 7, 8, 9 and 10 of the indictment. [See App. I: (11), (12); App. II: (6), (7)]. Count VII was dismissed by the trial court and the remaining counts were sent to the jury. The jury found for appellant Prudhomme on count V but convicted him of counts VIII, IX and X. These counts

---

30. As previously discussed, the Court had earlier stricken all evidence relating to the January 5, 1966 accident [App. I: (4); App. II: (3)] resulting in the dismissal of counts I through IV of the indictment. In effect, the Court here had found, as a matter of law, the January 5 staged collision to be the result of a separate and distinct con-

spiracy from that resulting in the other staged collisions proved at trial. (See note 4, *supra*).

31. Without objection by Prudhomme or any other defendant, the trial Judge had ruled that no defendant would call any co-defendant as a witness during the course of the trial.

were based on the June 29, 1966 staged collision. [See App. I: (12); App. II: (7)]. Two of the passengers testified at trial that Prudhomme had recruited them to participate in the accident.[32] Appellant Prudhomme attempted at trial to introduce excerpts from the Grand Jury testimony [33] of appellant DeVille in which DeVille testified that it was he (not Prudhomme) who recruited the two passengers.[34] The government objected to introduction of the Grand Jury testimony on grounds that it was not possible to cross-examine DeVille with regard to earlier testimony. The trial court sustained the objection and appellant was permitted only to make a proffer for the record on appeal.

It has been generally held that allegations by defendants jointly accused that conflicting and antagonistic defenses will be offered at trial do not necessarily require granting a severance. Allen v. United States, 1952, 91 U.S.App. D.C. 197, 202 F.2d 329, cert. denied, 1952, 344 U.S. 869, 73 S.Ct. 112, 97 L. Ed. 674. Even if hostility should appear among the co-defendants or they attempt to cast blame on each other, it does not compel the granting of separate trials. Baker v. United States, 10 Cir., 1964, 329 F.2d 786, cert. denied, 1964, 379 U. S. 853, 85 S.Ct. 101, 13 L.Ed.2d 56.

Clearly the testimony was not admissible on any basis. DeVille had not testified so it was not impeachment, and there was nothing in the government's relation to the Grand Jury testimony of the management of the case to raise it to the place of an admission. It was plain, unadulterated hearsay which, although of value perhaps by way of discovery, could not be used in the fashion proffered.

### Assertions Of Withdrawal

Finally, we regard as unmeritorious appellant Hennigan's and appellant Hamilton's contentions that they withdrew from the conspiracy prior to its termination and thus were prejudiced by being tried jointly with the other defendants.

It is alleged by Hennigan that his affirmative action of "running Kenneth DeMary out of his office" upon being solicited to participate in the April 25, 1966 collision [App. I:(9); App. III:(4)] was effective to terminate the agreement, hence his criminal liability, as one who withdrew from the conspiracy. Hennigan contends that the testimony of Kenneth DeMary indicated that thereafter, appellant handled numerous cases which he did not know were fraudulent. The record does not require this conclusion.[35] The jury was entitled to

---

32. This was the only direct evidence presented at trial which linked appellant Prudhomme with the June 29, 1966 staged collision.

33. The Grand Jury testimony had been voluntarily provided by the prosecution for the defendants' use in preparing their defenses.

34. In the Grand Jury testimony appellant DeVille testified in part:
" . . . Well, Larry told me to get a car with four riders and a hitter and set up an accident to happen either in Alexandria or right around Lake Charles. We were going to try to have it out of Lake Charles because we didn't want to have too many right in Lake Charles. I could get a car—I got the car. Dennis LeJeune's wife had a car, and they were two of the passengers; Dennis wasn't, but the wife was one of the passengers. I got the rest of the passengers—Nolan Breaux and

Iva Pitts, and her husband—I don't remember his name, and Mr. and Mrs. Pitts, to ride. And for this I was going to get $25.00 apiece for each rider and $50.00 for getting the car . . . "

35. We are not misled by their counsel's argument. These appellants argue in their briefs that Kenneth DeMary testified that every lawyer knew of the fraudulent nature of each collision in which he represented claimants. In an effort to show contradiction, appellants then point out that under cross-examination Kenneth DeMary admitted that Hennigan "handled a lot of people the same way, that he wasn't told it was a fraud accident." Our reading of this latter statement reveals that it was lifted out of context. Kenneth DeMary readily admitted that Hennigan was not aware of the fraudulent nature of the collision initially, but was told prior to the settlement of the claims. His state-

conclude that Hennigan's conduct subsequent to the April 25, 1966 collision in which he declined to participate, is anything but consistent with withdrawal from the conspiracy. Though Hennigan and Shaheen were residents of Lake Charles, they represented the claimants of the "hitter" vehicle in the May 25 staged collision in Shreveport. [See App. I:(10); App. III:(5)]. There was ample evidence adduced at the trial from which the jury, as they obviously did, could find that Hennigan's participation in this staged collision was knowing and deliberate.[36]

Appellant Hamilton contends that his affirmative act of withdrawal from the conspiracy occurred subsequent to the March 10, 1966 staged collision [App. I:(7); App. II:(5)] in a discussion with one of the claimants from that accident and his wife. This claimant and his wife testified that Hamilton so indicated that after he obtained settlement for his clients in the March 10 collision, he intended to have nothing further to do with the scheme. We find nothing in the record which indicates that appellant Hamilton communicated this intention beyond these relatively minor and "passive" (see note 22, *supra*) participants in the scheme. This same witness testified that Hamilton had tried unsuccessfully to persuade him to reconsider and file a claim after he had decided to "back out" after the staged collision.

Even if we accepted appellant Hennigan's and Hamilton's arguments that they withdrew from the conspiracy, we find no merit to their contentions that they were prejudiced by being tried jointly with the other defendants. The trial Judge's instructions to the jury to consider the evidence against each defendant separately as if they were being tried alone adequately protected them (see note 29, *supra*).

On our review of the record in this case, we conclude that the trial Judge did not err in denying a severance to any of the appellants.

### Denial Of Motions For Bill Of Particulars

Appellants contend that the trial court's denial of their pre-trial motions for a bill of particulars [37] violated

---

ment upon which appellants rely as inconsistent testimony was clearly intended as an expression of his opinion that many personal injury lawyers, of which Hennigan was one, represent claimants whom they believe to be legitimate but in actuality they are participants in staged collisions.

The testimony of Kenneth DeMary did not, as appellant Hennigan's counsel states in his brief, require the conclusion that after the episode where he ran Kenneth DeMary out of his office Hennigan handled numerous cases which he did not know were fraudulent.

36. Testimony indicated that appellants Hennigan and Shaheen never saw their clients, but rather had Kenneth DeMary obtain the claimants' signatures on employment contracts to cover the advance.

37. F.R.Crim.P. 7(f) provides the following:
(f) Bill of Particulars. The court may direct the filing of a bill of particulars. A motion for a bill of particulars may be made before arraignment or within ten days after arraignment or at such later time as the court may permit. A bill of particulars may be amended at any time subject to such conditions as justice requires.
As amended Feb. 28, 1966, eff. July 1, 1966.

1966 Amendment
Deleted "for cause" following "court" in the first sentence of subsection (f); and provided that a motion for a bill of particulars may be made "before arraignment or within ten days after arraignment or at such later time as the court may permit" rather than "only within ten days after arraignment or at such other time before or after arraignment as may be prescribed by rule or order".

Appellants submit that the 1966 amendment to Rule 7(f), which deleted the requirement for a showing of cause by the defendant prior to the Court ordering the government to furnish the particulars requested by an accused, intended to liberalize the formerly technical remedy envisioned by Rule 7(f) such that a defendant is accorded greater pretrial discovery. It is argued that when, as they allege was the case here, the particulars requested were necessary both to allow them preparation of a defense and to avoid prejudicial surprise at the trial, there is no discretion with the Court to refuse.

their Sixth Amendment right to be allowed to prepare a proper defense and thereby denied them a fair and impartial trial.

Appellants in their motions for bills of particulars sought from the government information concerning (i) the overt acts, other than those specifically listed in count XIII of the indictment, which were known to the government which it intended to introduce at trial, (ii) the names and addresses of participants who rode in automobiles used in the collisions the government alleged were staged, and (iii) the exact locations and the times of the various collisions which were alleged to be fraudulent collisions. The government opposed providing this information on grounds that the material is evidentiary in nature. The trial court sustained the objection and denied the information to the defendants. The Court granted, however, all motions filed by the defendants to the extent that they sought discovery and inspection of (i) their written or recorded statements or confessions, (ii) reports made of any oral statements or confessions, (iii) their respective recorded testimony before the Grand Jury which returned the indictment and (iv) the mailings described in all substantive counts of the indictment and in the overt acts alleged in count XIII of the indictment. The documents provided by the government included, in addition to information relating to those collisions enumerated in the indictment, information relative to those collisions brought out at trial but not described in the indictment. [See App. III:(1), (2), (3), (4), (5), (6)].

We are of the opinion that appellants were provided those materials necessary to advise them of the nature and cause of the accusation against them such that they suffered no infringement of their Sixth Amendment rights. The fundamental purpose of an indictment is to inform a defendant of the charges against him so that he may adequately defend himself. In an indictment for conspiracy to commit a criminal offense, the elements of that offense need not be stated with the same particularity as would be required in an indictment for violation of the substantive offense. Wong Tai v. United States, 1927, 273 U.S. 77, 47 S.Ct. 300, 71 L.Ed. 545; Brown v. United States, 5 Cir., 1969, 403 F.2d 489; United States v. Williams, N.D.Ga., 1969, 309 F.Supp. 32, 35. In Wong Tai v. United States, *supra*, the Court set out the requirement for an indictment for conspiracy as follows:

"It is well settled that in an indictment for conspiring to commit an offense—in which the conspiracy is the gist of the crime—it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy * * *, or to state such object with the detail which would be required in an indictment for committing the substantive offense * * *. In charging such a conspiracy 'certainty to a common intent, sufficient to identify the offense which the defendants conspired to commit, is all that is' necessary. Williamson v. United States [207 U.S. 425, 447, 28 S.Ct. 163, 52 L.Ed. 278, 290] * * *." (citations omitted).

We have held before that the government is not limited to overt acts pleaded in proving a conspiracy. It may show other acts of the conspirators occurring during the life of the conspiracy. United States v. Ayres, 5 Cir., 1970, 434 F.2d 60, cert. denied, Sidney v. United States, 1971, 401 U.S. 938, 91 S.Ct. 930, 28 L.Ed.2d 217; Reese v. United States, 5 Cir., 1965, 353 F.2d 732. Thus, we find unconvincing appellant's argument that they were surprised by the government's proof adduced at trial of additional accidents not stated in the indictment. While a bill of particulars has for its purpose informing a defendant of the nature of the charges against him so that he will have sufficient detail to prepare for this defense, to avoid or minimize the danger of surprise at trial, and to enable him to plead double jeopardy in the event of a subsequent prose-

cution for the same offense, Hickman v. United States, 5 Cir., 1969, 406 F.2d 414; United States v. Bearden, 5 Cir., 1970, 423 F.2d 805, it may not be used to obtain a detailed disclosure of the government's evidence prior to trial. United States v. Bearden, 5 Cir., 1970, 423 F.2d 805; Downing v. United States, 5 Cir., 1965, 348 F.2d 594, 599, cert. denied, 1965, 382 U.S. 901, 86 S.Ct. 235, 15 L.Ed.2d 155.

### Speedy Trial

Appellants argue that the three year and twenty-three day period which elapsed between their indictment and the commencement of their trial [38] exceeded the bounds of permissible delay and deprived them of their Sixth Amendment right to a speedy trial. We disagree.

Our analysis of appellants' contention in this regard is aided immeasurably by two recent decisions. In Barker v. Wingo, 1972, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101, the Supreme Court mandated an *ad hoc*, case-by-case balancing approach to speedy trial issues and identified several criteria to be applied. In United States v. Lane, 5 Cir., 1972, 465 F.2d 408, this Court applied the *Barker* analysis to a complex conspiracy case.

Writing for the *Barker* court, Mr. Justice Powell identified the four basic touchstones of the speedy trial analysis:

[i] length of delay,

[ii] the reason for the delay,

[iii] the defendant's assertion of this right, and

[iv] prejudice to the defendant.

Barker v. Wingo, *supra*, 407 U.S. at 530, 92 S.Ct. at 2192, 33 L.Ed.2d at 117. But, "several other considerations are also inherent in the *ad hoc* approach which the *Barker* decision requires—the gravity of the charged offense and likelihood of repetition, the number and complexity of legal and factual issues involved, the availability of evidence, etc." United States v. Dyson, 5 Cir., 1972, 469 F.2d 735, 739.

In *Lane*, we examined a single appellant's allegation of speedy trial error in light of these factors. Like the case at bar, *Lane* involved a multi-count conspiracy indictment against multiple defendants for an insurance fraud. Thirty of the thirty-six alleged conspirators under indictment pleaded guilty. The ring leader of the conspiracy died before he could be brought to trial. All of the remaining five defendants went to trial and were convicted. Only Lane appealed.

The delay between the indictment and the *Lane* case and the trial was two years, seven months, and five days. Twenty-five assorted motions were filed by the various defendants during this time period. Much of the government's time was also expended in marshalling thirty-two government witnesses and 152 government exhibits, and preparing to cross-examine over forty-eight defense witnesses.

Comparing the concrete facts of the case at bar with *Lane*, we are convinced that these appellants were not denied their Sixth Amendment rights.

Of the four identifiable *Barker* criteria, only the length of the delay appears more onerous in this case. The three year and twenty-three day delay here was five months and eighteen days greater than the delay in *Lane*.[39] But we

---

38. The indictment was returned by the Grand Jury on October 3, 1967. Trial commenced on October 26, 1970 and ran about seven and a half weeks with the verdict being delivered on December 18, 1970.

39. "The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance. Nevertheless, because of the imprecision of the right to speedy trial, the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case. *To take but one example, the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge.*" Barker v. Wingo, *supra*, 407 U.S.

believe that the justifications for the delay overwhelmingly compensate for this slight difference.

We need go no farther than the reason for the delay to make the point. In the case at bar, well over twenty-five motions were filed by the sixteen defendants who went to trial. (A complete chronology is set forth in App. IV). The motions sought discovery, bills of particulars, severance, change of venue, dismissal of the indictment, and dismissal for failure to prosecute, among other things.

With commendable patience the Judge attempted to give all parties an opportunity to make their motions on a particular subject before he would take any motions on that subject under submission. But his efforts to conserve judicial time and expedite the trial were thwarted on every front. For example, on December 18, 1967, slightly more than two months after the indictment, the Judge notified all parties that he would give them all an opportunity to file their motions before he would entertain any of them. On May 9, 1968, the Judge set June 12, 1968 as the day for the hearing of all motions for a change of venue (among those with a motion for change of venue pending was Appellant Prudhomme). The pending motions for change of venue were heard as scheduled, and denied on September 24, 1968. Over a year later, on November 6, 1969, defendant Prudhomme filed a second motion for change of venue. This is merely indicative. There are many other examples (see Appendix IV).

Another problem was the change of counsel. As late as the Spring of 1970, there were eleven changes of counsel.

The third *Barker* criterion, the defendant's assertion of his right, is also illustrative. Most of the motions now claimed to be a plea for a speedy trial were in fact motions to dismiss for failure to prosecute. Usually they were filed in tandem with several motions for other relief. Clearly the defendants were not asking for an immediate trial and simultaneously requesting discovery, severance, change of venue, or substitution of counsel.

Throwing all of the facts into the scales, we are unable to perceive any material distinction between *Lane* and the case at bar. The one controls the other. Appellants' speedy trial argument is rejected.[40]

### Sufficiency Of The Evidence

The professional appellants here attack on appeal the sufficiency of the evidence adduced below. They attack, not the evidence establishing the actual mailings which formed the basis of the substantive counts of mail fraud, but the evidence tending to establish their knowing and deliberate participation in the fraudulent nature of the scheme. It was held long ago by this Court that once the jury has found the existence of a conspiracy (agreement), only slight additional evidence is necessary to connect the defendant with the conspiracy. Tomplain v. United States, 5 Cir., 1930, 42 F.2d 202. Using a back door approach to the same result, our review of the record convinces us that the evidence connecting the professional appellants with the conspiracy presents iron clad proof of the existence of the agreement.

The convicted professionals, five lawyers and two physicians in number, are

---

at 530, 92 S.Ct. at 2192, 33 L.Ed.2d at 117. Because we hold that this case is controlled on its specific facts by *Lane*, we expressly decline to decide whether a three year and twenty-three day delay in a complex conspiracy case is sufficient to pull the trigger.

40. Because we are convinced on the totality of circumstances that appellants' claim that they were not given a speedy trial is not

meritorious, we decline to enter the thorny thicket of determining whether, and to what extent, "prejudice" to the defendants' interests was a result of the delay. Where the appellants fail to establish a prima facie case on the other points of the *Barker* analysis there is no need to grapple with the issue of prejudice unless, of course, appellants made a specific showing of prejudice—which they have not.

unanimous in their contention that they were misled by both their clients, or patients as the case was, and the DeMary brothers as to the fraudulent character of the collisions. They contend that the testimony relied on to establish their knowing complicity was self-serving,[41] uncorroborated and unreliable.[42] Appellants point to certain testimony by the government's key witnesses which was controverted by others of the government's witnesses [43] and argue tenaciously that these inconsistencies undermine from the validity of the verdict.

We find these contentions without merit. Not only do we refuse to invade the province of the jury, except where the most compelling absence of evidence so dictates, here we perceive much more than the slight evidence required. Tomplain v. United States, supra. Other than the testimony of Kenneth and Larry DeMary and others similarly situated, which is assailed on common grounds (see notes 41 and 42, supra), the showing on the crucial question of knowledge on the part of the convicted professionals was entirely circumstantial. Nonetheless, it was substantial. Repeatedly, the lawyers dealt, not with their clients, but directly with the DeMary brothers and their appointees. Money exchanged hands, employment contracts were signed, and promissory notes were executed without the lawyers ever having laid eyes on the second party to the transaction. The appellant doctors were repeatedly visited by uninjured patients complaining of similar neck and back related injuries sustained in rear end collisions in the same general locale and repeatedly referred to them by the same lawyers. For these nonexistent injuries minimal treatment was administered and inflated bills were submitted. Exceeded, and then super-exceeded, were the limits of such possible, though hardly probable, explanations as mistake, omission, coincidence, and naivete. At some point knowledge may be imputed. Testimony indicated, as avoidance of detection clearly dictated, that an understanding was early reached that none of the clients or patients would be told of the lawyers or physicians knowledge of or complicity in, the fraudulent nature of the scheme. The testimony at trial indicated, with certain infrequent exceptions, that the substance of this understanding was thoroughly and consistently followed throughout the duration of the conspiracy.

Appellant attorneys Tunis and Loridans were charged initially in counts VII, VIII, IX, X, and XIII of the indictment. After count VII was dismissed by the trial court for insufficient evidence, they were convicted by the jury on the remaining counts as charged. All of the substantive mail fraud counts (VIII, IX, and X) arose from activities related to the collisions staged in Iowa on June 29, 1966. [See App. I: (12); App. II: (7)]. The government adduced evidence at trial of four additional staged accidents in which Tunis and

---

41. Appellants contend that both Kenneth and Larry DeMary were granted special privileges by the government, including shortened prison terms and parole, in return for their testimony. It is further contended that other government witnesses were induced to cooperate because the government held over their heads the ability to charge them with participation in the conspiracy, prescription not having run at the time of the trial.

42. The professional appellants vigorously attack the credibility (criminal character) of those who testified against them at the trial. Here it is well settled that such credibility is well within the province of the jury as the trier of fact, whose competence in such matters is practically unquestionable.

43. A specific example of such uncontroverted testimony cited by appellants was that Kenneth DeMary testified that he never involved persons in any collision who did not know in advance that the collision was staged. Certain of the government's other witnesses stated, however, that they had no knowledge beforehand of the collision in which they were involved.

Another example cited was that Larry DeMary stated that he had informed attorney Nathan Cormie in Joyce (Donna) DeMary's presence, that the April 25, 1966 collision was fraudulent. This was denied, both by Nathan Cormie and Joyce (Donna) DeMary.

Loridans represented the claimants. Three of these were prior to the June 29 collision described in the indictment (they occurred on March 28 in Shreveport, April 25 in Lake Charles, and May 25 in Shreveport) [App. I: (8), (9), (10); App. III: (3), (4), (5)] and one was subsequent (July 17, 1966 in Luckey) [App. I: (14); App.III: (6)]. In addition to the direct testimony of Kenneth DeMary,[44] Larry DeMary,[45] Joyce (Donna) DeMary,[46] which is attacked by appellants as self-serving, the testimony of certain of the passengers in the staged collisions tends to show Tunis' and Loridan's knowing complicity in the scheme.[47]

There is testimony showing that employment contracts securing the services of Tunis and Loridans and promissory notes securing their advance payments were routinely signed prior to the accidents. That both Tunis and Loridans envisioned multiple future staged collisions was vividly portrayed by the special arrangement reached by them with Kenneth DeMary regarding repayment of money already advanced before they learned that the insurance policy on the hitter vehicle had been cancelled prior to the March 28, 1966 staged collision in Shreveport. [See App. I: (8); App. III: (3)]. (See our previous discussion under the section of the opinion entitled *Separate or Multiple Conspiracies, supra*). Finally, there is ample direct evidence, if credited, from which the jury

could find, again as they did, that Tunis and Loridans committed one or more of the overt acts charged against them in count XIII of the indictment.

Appellant attorney Hennigan was charged initially in counts I through IV and count XIII of the indictment. [See App. I: (4); App. II: (3)]. Upon the trial court's dismissal of counts I through IV, only count XIII went to the jury upon which he was convicted. Evidence adduced at trial established Hennigan's participation in five of the staged collisions [App. I: (1), (3), (6), (7), (10)] in addition to the January 5 accident which, when stricken by the trial court, caused the dismissal of counts I through IV against him. In addition to one arising out of the January 5, 1966 accident which was stricken below, Hennigan was charged in count XIII of the indictment with the commission of two overt acts (both involving mailings), one arising out of the November 3, 1965 accident [App. I: (1); App. II: (1)] and the other arising out of the January 4, 1966 accident. [See App. I: (3); App. II: (2)]. Appellant Shaheen, Hennigan's law partner in Lake Charles, was initially charged in counts I through VI and XIII of the indictment. [See App. I: (4); App. II: (3)]. Counts V, VI, and XIII against him were ultimately sent to the jury for which convictions were returned. Evidence adduced by the government established Shaheen's participation in at least one other staged collision,[48] in addition

<hr>

44. Kenneth DeMary testified that he had freely discussed the fraudulent nature of the collisions with Tunis and Loridans. Appellants retort on appeal by attempting to discredit his testimony. (See notes 41, 42, and 43, *supra*).

45. Larry DeMary also testified that Tunis and Loridans were aware of the fraudulent nature of the collisions. On appeal appellants also attempt to discredit his testimony. (See notes 41, 42, and 43, *supra*).

46. Joyce DeMary testified that Tunis and Loridans actually advised her in an open discussion regarding the injuries she should claim were sustained in the April 25, 1966 staged collision in Lake Charles. [See App. I: (9); App. III: (4)].

47. Two of the passengers in the July 17, 1966 staged collision in Luckey, Louisiana [App. I: (15); App. III: (6)] testified that, subsequent to the accident, they went to the law offices of Tunis and Loridans in New Orleans to pick up their settlement checks. Upon being advised by Tunis that the accident was under investigation by the authorities, they stated that they attempted to withdraw from pursuing the claim but Tunis advised them that they had to take the money and keep their mouths shut.

48. This was the May 25, 1966 staged collision in Shreveport. [See App. I: (10); App. III: (5)].

to the June 1, 1966 and July 14, 1966 [App. I: (11), (13); App. II: (6), (8)] accidents, which formed the basis for counts V and VI of the indictment respectively, and the January 5, 1966 accident, evidence of which was stricken by the trial court. He was also charged with two overt acts, reference to one of which was stricken with the January 5, 1966 accident, the remaining two [49] arising out of the July 14, 1966 staged collisions in Sulfur. [See App. I: (13); App. II: (8)]. Again, we conclude that sufficient evidence was adduced to support the jury's finding that appellants Hennigan and Shaheen were apprised of the fraudulent nature of the collisions and knowingly entered into the overall agreement. There was direct testimony adduced that appellant Hennigan and Shaheen represented claimants in staged collisions without ever conferring with or even seeing the clients from beginning to end. Again, as with Tunis and Loridans the signing of employment contracts, execution of promissory notes, and exchange of money occurred between the appellant attorneys and one of the DeMary brothers. There is direct testimony that both of these appellant attorneys were fully aware of the fraudulent nature of the collisions.[50] Testimony established that subsequent to the February 17, 1966 collision in Monroe, Louisiana [App. I: (6); App. III: (2)] one of the claimants represented by Hennigan was unavailable to endorse the settlement check and sign the release. To solve this problem Kenneth DeMary, in Hennigan's presence, signed the claimant's name to the check and release after which Hennigan notarized the release, certifying that the claimant had personally appeared before him. There was testimony also that appellant attorney Shaheen customarily demanded and received "kick-backs" in addition to his regular fee for those staged collisions in which he represented claimants. Following the June 1, 1966 collision, one of the claimants testified that upon receiving from Shaheen an advance on the anticipated settlement, the bulk of the advance was turned over to appellant Prudhomme for transmission to the DeMarys. There is direct testimony that Shaheen had counseled the DeMary brothers on the type of injuries the claimants should complain of and stated that whiplash injuries could not be detected by means of x-rays. It was testified that he further suggested that pregnant women be used as riders where possible, so they could claim various pregnancy related injuries incurred in the collisions.

Further testimony from two witnesses indicated that upon learning that appellant DeVille had absconded with the money advanced to the claimants after the July 14, 1966 accident [App. I: (13); App. II: (8) ], both Shaheen and Hennigan were fearful that DeVille would ultimately inform on them to the authorities.

Appellant attorney Hamilton was charged only in count XIII of the indictment. Evidence adduced by the government at trial showed his involvement in two of the staged collisions.[51] One of the claimants in the March 10, 1966 collision testified that he had decided immediately after the collision to abandon his intention to pursue his claim but that appellant Hamilton had unsuccessfully sought to persuade him to reconsider and file a claim. This passenger further testified that while the other claims were still pending, he and his wife had met with Hamilton to discuss

49. These overt acts charged that appellant Shaheen (i) wrote a letter and (ii) endorsed a promissory note, both in furtherance of the conspiracy.

50. The credibility of this direct testimony was similarly assailed. (See note 41, 42, and 43, supra).

51. Evidence of appellant attorney Hamilton's participation was established in the November 3, 1965 collision in Bossier City [App. I: (1); App. II: (1)] and the March 10, 1966 staged collision in Pineville, Louisiana [App. I: (7); App. II: (5)].

an unrelated matter at which time Hamilton stated that after he obtained settlement for his clients on this staged collision, he intended to have nothing further to do with the scheme.[52] Appellant Hamilton was charged with, and the evidence was adduced relating to, the commission of three overt acts in furtherance of the conspiracy.[53] Again, there can be little question that, if credited, sufficient evidence was brought out at trial to allow a jury to find Hamilton's knowledge that the collisions and injuries were fraudulent.

Appellant Dr. Morris was initially charged in counts I through X and count XIII. [See App. I: (4), (11), (12), (15); App. II: (3), (6), (7), (8)]. After the trial court's dismissal of counts I through IV and count VII Morris was convicted by the jury of those counts remaining. Discounting appellant Morris' involvement in the January 5, 1966 accident which was dismissed by the trial court, evidence adduced at trial established his participation in six staged collisions [54] other than those staged collisions which formed the basis for the counts upon which he was indicted.[55] Appellant Dr. Perego was charged under and convicted of counts VI and XIII of the indictment. Evidence adduced at trial established his participation in three staged collisions [56] out of which his conviction under count VI of the indictment arose. As was the case with the other indicted profession-

als, direct testimony established that Doctors Morris and Perego were fully apprised of the fraudulent nature of the injuries which they claimed to be treating. Further testimony indicated that frequently they submitted inflated bills for treatment not rendered. A passenger in the June 1, 1966 staged collision [App. I: (11); App. II: (6) ] testified that, immediately following the collision, his pregnant wife, also a passenger in the collision, was rushed by ambulance to the hospital. Upon arrival at the hospital Dr. Morris was not there, so Larry DeMary hurriedly departed, only to return shortly thereafter accompanied by Dr. Morris who thereafter served as the attending physician for the pregnant woman. This same passenger testified that upon recruitment to serve as a passenger in the staged collision, he was informed by Larry DeMary that Doctors Morris and Perego were "in on the accidents." Certain of the passengers testified that the doctor's thorough examination failed to reveal such existing conditions as "total blindness", in one instance, and "late pregnancy" in another. Testimony adduced at trial indicated that Perego was heard to boast that it was fantastic that on some of these patients he only saw them once but was submitting bills and reports reflecting numerous visits and treatments. On one occasion, the testimony revealed that appellant attorney Shaheen was dissatisfied with Dr. Morris's bill as submitted and requested that Joyce (Donna) De-

---

52. This testimony formed the basis for appellant Hamilton's argument (previously discussed) that he should have been granted a severance on grounds that he withdrew from the conspiracy.

53. The first overt act charged that he wrote a letter arising out of the November 3, 1965 accident. [See App. I: (1); App. II: (1)]. The latter two overt acts charged that he both wrote a letter and signed and endorsed a promissory note, both arising out of the March 10, 1966 staged collision. [See App. I: (7); App. II: (5)].

54. These were the accidents occurring on December 29, January 4, January 6, March

10, April 25 and July 27 of 1966. [See App. I: (2), (3), (5), (7), (9), (15)].

55. Count V arose out of the June 1, 1966 accident [App. I: (11); App. II: (6)], count VI arose out of the July 14, 1966 staged accident [App. I: (13); App. II: (8)], and counts VIII, IX, and X arose out of his involvement in the June 29, 1966 staged collision [App. I: (12); App. II: (7)].

56. These were the staged collisions occurring on January 6, 1966, June 29, 1966, and July 27, 1966 [App. I: (5), (12), (15); App. II: (4), (7), (9)].

Mary obtain a new bill from Dr. Morris reflecting additional visits. This request was complied with.

Our review of the record in this case convinces us that the inference was justified that the convicted professionals knew of the fraudulent nature of the collisions and injuries. With that knowledge their active and essential role in executing the design made them co-conspirators with the convicted laymen in its accomplishment.

*Remaining Issues*

Appellant Trahan contends on appeal that the trial Judge reproved him in the presence of the jury creating fatal prejudice against him in the minds of the jurors.[57] It is further contended that, after the remonstration complained of, the Court failed to even attempt curative measures designed to rid or alleviate the prejudicial effect of the incident toward appellant in the minds of the jurors.[58] We cannot agree.

57. Appellant Trahan was charged in count VI of the indictment as having acted as an organizer in setting up the July 14, 1966 accident. Gloria Farque Young testified for the government that she had ridden as a passenger in the target vehicle and that she subsequently asserted a fraudulent damage claim. On being questioned by the prosecution, Mrs. Young was asked if she had ever been threatened in connection with her testifying as a government witness, to which she replied:
"I don't know whether you'd call it a threat, a real threat or not, but I—it was sometime after the accident and I had gone to the Geisha House and A. L. Prudhomme and, I think, I'm not positive—I think William Trahan was there, and he asked—it might be you—someone was there. I don't remember exactly who it was."
Following this statement Trahan's counsel promptly objected and requested of the Court that this conjectural reference to his client be stricken from the record. At that time the Court remarked:
"I am going to ask your client to sit around the other side of the table. Sit around the other side of the table."
Appellant Trahan had been seated in the chair at the end of the table nearest the witness. Trahan contends that, at the unexpected mention of his name, he had turned his head to the side to look at the witness. It is asserted by appellant that the trial Judge, by his demeanor and tone of voice, had appeared to be irritated with appellant. Appellant Trahan avers that he had not in any way glowered or assumed any semblance of an intimidating demeanor toward the witness.

58. During the argument on the motion for a mistrial, the following exchange took place between the Court and appellant's counsel:
THE COURT:
"I will dispose of the motion in this fashion, counsel. I say, first of all, nobody is going to sit in that chair where you have

been sitting and where Mr. Trahan has been sitting until the time I asked him to move over to the other side. The reason why I asked Mr. Trahan to move to the other side is because, when Mrs. Young was testifying, Mr. Trahan, in that particular seat, was constantly turning around and looking at Mrs. Young. And when he was in that position, he was no more than about two or three feet from the witness, and I could see it was making her uncomfortable, and this is why I asked him to move and that is why no one else is going to sit in that chair in this position, which is between the shield of the witness stand and the counsel table.
"And the table is about three—I'd say three and a half feet from the witness stand shield there.
"So whether Mr. Hamilton sat in that position or not is not material. It is my recollection he did not. He sat on the end of the table."
MR. CULP:
"I will be glad to adduce testimony he did sit in this chair for a number of days."
THE COURT:
"He may have sat in the chair, but the chair was over here and this isle was kept open, and it is going to be kept open from here on out. Neither you, Mr. Trahan, nor any other attorney or defendant is going to occupy that chair in that position.
"Now I hope that is clear, and your motion is denied."
MR. CULP:
"Could you instruct the jury to that effect?"
THE COURT:
"I will tell the jury about it. Just call it to my attention on Monday."
MR. CULP:
"Thank you, Your Honor."
THE COURT:
"Make no mistake about what my reason was, and that is why I dictated it into the record. I did not think it was—it may

Our reading of this portion of the trial transcript leaves us unable to conclude that the comments of the trial Judge had any purpose or effect to disparage either appellant Trahan or his lawyer before the jury.

■■■ We also reject the argument of appellant Perez that he was denied his Sixth Amendment right to confront the government witnesses, Sue Jefferson and Joyce (Donna) DeMary. The record clearly shows that, with regard to the former, his counsel joined in agreement with the rest of the defense counsel that they did not wish to cross-examine her. With regard to Joyce (Donna) DeMary, appellant has failed to show that he was prejudiced in any way by the four-day delay before a resumption of cross-examination.

Having discussed all assignments of error raised in this appeal which we regard as meriting discussion, we affirm the judgment of the trial court as respects all appellants on all counts under which they were convicted.

Affirmed.

## APPENDIX I

The following is a chronological synopsis of the staged collisions of which the government adduced evidence at the trial. An asterisk (*) denotes a staged collision which was not alleged in the indictment, but nevertheless, which formed a part of the government's case-in-chief for purposes of showing intent.

1. November 3, 1965—Bossier City, Louisiana

The organizers of this staged collision were appellants Mayo Perez, Larry DeMary and Kenneth DeMary. Also

participating in this accident were appellant attorneys Lloyd Hennigan and Ernest Hamilton who handled fraudulent claims. Kenneth DeMary contacted Charlie Winn who arranged for his girlfriend, Sue Jefferson, to drive her vehicle as the "hitter." Winn drove the target vehicle. For his assistance, it was agreed by the organizers that Winn would receive a kickback from the advance money they anticipated receiving from the attorneys to be retained. After the collision, Kenneth and Larry DeMary contacted attorney Hennigan about representing them in their claims against Jefferson's insurance carrier. Hennigan agreed to handle the claims and advanced $1000 to Kenneth and $600 to Larry against the anticipated insurance settlement. Perez and another rider named McGee retained attorney Hamilton, who also made advancements to them against their anticipated settlement. The claimants consulted both a doctor, Dr. Harry Snatic, Sr., and a dentist, Dr. Snatic, Jr., for alleged injuries received, medical reports and bills of which were sent to both Hennigan and Hamilton for forwarding to the insurance carrier. After negotiation, Hennigan and Hamilton were successful in settling the fraudulent claims from this staged collision with the insurance carrier for a total sum of over twelve thousand dollars. Both the mailing of a letter by Hamilton and the mailing of medical reports by Hennigan to the insurance carrier were named as overt acts in count XIII of the indictment.

* 2. December 29, 1965—Lake Charles, Louisiana

Appellants Mayo Perez and Larry DeMary were the organizers for this

---

have been worse had I said something about it at the time. You do not want me to tell them the reason why I had Mr. Trahan moved and I allowed you to sit there, because you were seated there with your back to the witness. I never did see you turn around to look at the witness, and I did not want to cause any disruption in the course of the trial here by having the chairs moved around here at that

time, but they are going to be moved and there will be no chair there on Monday." In response to the request by Trahan's counsel to instruct the jury, the trial Judge stated:

"Furthermore, I rearranged the tables—rather, the table on the right, at this end, so as to keep open this passageway and no defendant or counsel will occupy any seat at the end of that table."

staged collision. Joyce DeMary, Larry's wife, was recruited to ride as a guest passenger. Perez recruited two brothers to ride as guest passengers and to use their car as the target vehicle. Also recruited by Perez was the driver of the "hitter" who was instructed to hit the target vehicle with his taxicab. Following the collision, Larry DeMary took Joyce to attorney Nathan Cormie who advanced her $700 against an anticipated settlement. Joyce was hospitalized with appellant Dr. Wilson Morris as her attending physician. Two other passengers were taken by Larry DeMary to the law offices of Roach, Hennigan and Shaheen where they were represented by attorney Larry Roach who also issued to them advance payments against their anticipated settlements.

3. January 4, 1966—Lake Charles, Louisiana

The organizers of this staged collision were appellants Larry DeMary and Mayo Perez. The "hitter" vehicle was driven by Francis Esthay. The claimants were taken by Perez to appellant Dr. Morris for "treatment." Appellant Hennigan represented four of the five claimants making the usual advance payments against anticipated settlements. Overt act number 3 by Hennigan as listed in count XIII of the indictment arose out of this staged collision.

4. January 5, 1966—Lake Charles, Louisiana

This staged collision was organized by a brother of Kenneth and Larry DeMary, Earl DeMary. Earl DeMary recruited the participants which included his wife, Elda DeMary. Elda DeMary was accompanied in the target vehicle by her sister and four other passengers. The "hitter" vehicle was a rented car actually driven by Francis Esthay, although the police were advised on the scene that passenger Margaret Douget was driving at the time of the accident. Following the collision, the occupants of the "target" vehicle went to the law offices of Roach, Hennigan and Shaheen where two of them were represented by appellant Hennigan and two others by appellant Shaheen. Several of the claimants consulted appellant Dr. Morris in connection with their alleged injuries. The participation of Earl DeMary and appellants Hennigan, Shaheen and Dr. Morris in this staged collision served as the basis for counts I, II, III and IV of the indictment, which were dismissed by the trial court.

5. January 6, 1966—Lake Charles, Louisiana

The organizers in this staged collision were Kenneth and Larry DeMary. Appellant Robert DeVille served as a recruiter as well as a "rider" in the target vehicle. Also serving as a "rider" was appellant, William Trahan. The DeMarys initially took the claimants to appellant attorney Hennigan, who advised them that he would be unable to handle the claims as he was attorney of record for Kenneth DeMary on the pending November 3, 1965 claim, and it would appear to be a conflict of interest if he took the case. It was therefore arranged through Hennigan's secretary for another Lake Charles attorney by the name of Payton Covington to handle the claims. Covington advanced each of the six claimants $500. Three of the claimants were referred by Larry DeMary to appellant Dr. Morris while the other three were referred by Kenneth DeMary to appellant Dr. Perego. Additionally, Larry DeMary referred three of the claimants, one of them being appellant Robert DeVille, to dentist Dr. Snatic, Jr. for alleged dental injuries sustained in the collision.

* 6. February 17, 1966—Monroe, Louisiana

This staged collision was organized by Kenneth DeMary with the assistance of appellant Alvin Evans, who did much of the recruiting. Part of the claimants were represented by appellant Hennigan while the remainder were represented by Covington. Both attorneys disbursed advance payments to their clients. One

of the claimants represented by Hennigan was Randall Meek, who was unable to be located upon ultimate settlement by the insurance carrier. To solve this problem, Kenneth DeMary, in Hennigan's presence, signed Meek's name to the check and release, which were then notarized by Hennigan, certifying that Meek had personally appeared before him. Those claimants residing in Bossier City were told by Kenneth DeMary to see Dr. Robert Parkman, while those who lived in the Monroe area were told to see any physician as often as possible.

\* 7. March 10, 1966—Pineville, Louisiana

Kenneth DeMary organized this staged collision as well as served as a guest passenger in the "hitter" vehicle. Appellant Robert DeVille served in a recruiting function and appellant Alvin Evans drove the "hitter" vehicle. Following the first impact, Evans and DeMary decided insufficient damage was done, so the target vehicle was hit a second time. After the collision, Kenneth DeMary instructed the "riders" in the target vehicle to retain appellant Ernest Hamilton. Hamilton, who was aware of the fraudulent nature of the collision, indicated that after he obtained settlement for his clients he intended to have nothing further to do with the scheme. The claims of two passengers in the "hitter" vehicle, including that of Kenneth DeMary, were handled by appellant Hennigan. Hennigan and Hamilton made a joint offer to the insurance company to settle all claims. The claimants obtained the necessary medical reports from Dr. Parkman and appellant Dr. Morris which were transmitted by the attorneys to the insurance carrier.

\* 8. March 28, 1966—Shreveport, Louisiana

Kenneth DeMary, with the help of Charlie Winn and appellant Alvin Evans, who served as recruiters, organized this staged collision. Inasmuch as the six passenger claimants were from the Bossier City area, they were referred by Kenneth DeMary to Dr. Parkman following the collision. The "hitter" vehicle used, which was driven by Walter Borsch, was Kenneth DeMary's truck and this led to a special complication not previously encountered. Advance checks had, prior to the collision, been issued by appellant attorneys Tunis and Loridans. These checks, immediately after the collision, had been cashed and distributed to the claimants by appellant Evans and the insurance carrier advised that Tunis and Loridans were representing the claimants. To the chagrin of both Loridans and DeMary, it was learned shortly after the collision that the insurance coverage on DeMary's truck had been cancelled prior to the collision. To solve this problem in a way designed to avoid suspicion, it was agreed that Loridans would file suit against Kenneth DeMary. The suit would be defended by Hennigan and, if needed, Loridans would obtain a judgment against DeMary. It was agreed that Kenneth DeMary would deduct the amount of money advanced by Tunis and Loridans from future advances on staged collisions. The suit was filed, but apparently never reduced to judgment. As agreed, however, DeMary repaid the advance money out of subsequent collisions handled by Tunis and Loridans.

\* 9. April 25, 1966—Lake Charles, Louisiana

The organizers in this staged collision were Larry and Kenneth DeMary. Both Larry DeMary and his wife Joyce DeMary, who was pregnant at the time, appeared as claimants. The DeMarys obtained the services of a milk truck driver to act as the "hitter" as well as two other persons to ride with Larry and Joyce in the "target" vehicle. Kenneth DeMary also arranged with appellants Tunis and Loridans prior to the collision to handle the claims. There is evidence that Tunis and Loridans advised Joyce DeMary immediately after the collision that she should claim aggravation of the whiplash injury sustained in a previous

staged collision. It was further arranged that the claimants would consult with appellant Dr. Morris. Tunis and Loridans guaranteed bank loans at a New Orleans finance company for their claimant-clients to serve as advances against anticipated settlement of the claims. From these advances, Tunis and Loridans were repaid by Kenneth DeMary the advances they had given for the March 28, 1966 collision. While suit was ultimately filed against the carrier by Tunis and Loridans, there was never any settlement made.

\* 10. May 25, 1966—Shreveport, Louisiana

The organizer of this staged collision was Kenneth DeMary who was assisted in recruiting by appellant Alvin Evans. All claimants from both vehicles were referred to Dr. Parkman for treatment of various whiplash-type injuries. The claimants from the "hitter" vehicle were represented by appellant attorneys Hennigan and Shaheen while those from the "target" vehicle were represented by appellant attorneys Tunis and Loridans. Hennigan and Shaheen, without ever seeing their clients, had Kenneth DeMary obtain the necessary signatures on employment contracts and promissory notes to cover the advances. Similarly, Tunis and Loridans issued advances for their clients directly to Kenneth DeMary. The claims handled by Tunis and Loridans were ultimately settled for over $6,000.

11. June 1, 1966—Lake Charles, Louisiana

This staged collision was organized by Larry DeMary with the assistance of Joyce DeMary acting as a recruiter. Upon soliciting one of the "riders," Larry DeMary informed him that appellants Shaheen, Dr. Morris and Dr. Perego were "in on the accidents." A total of four passengers were used including a pregnant woman. Because insufficient damage was done on the first impact, Larry DeMary instructed appellant DeVille, who drove the "hitter" vehicle, to strike the "target" vehicle a second time. All of the claimants were instructed by Larry DeMary to see either appellants Dr. Perego or Dr. Morris after the collision. The pregnant passenger was taken by ambulance to a hospital on the instructions of Larry DeMary. Upon arrival at the hospital Dr. Morris was not there, so Larry DeMary left and returned shortly thereafter accompanied by Dr. Morris. Appellant attorney Shaheen, who represented all of the claimants, demanded of Larry DeMary a "kick-back" of $250 on the advances which he made to the claimants. Medical reports of these claimants were prepared by Dr. Morris and forwarded to Shaheen for his use in making demand on the insurance company. The mailing described in Count V of the indictment arose out of this staged collision. Appellants Shaheen and Morris were convicted of Count V. Appellant Prudhomme, who was also named in Count V, was acquitted by the jury.

12. June 29, 1966—Iowa, Louisiana

This staged collision was organized by Larry and Kenneth DeMary with the "recruiting" assistance of appellant Andrew Prudhomme. Again, one of the passengers induced by Prudhomme to ride in the "target" vehicle was a woman in her sixth month of pregnancy. Also riding as a passenger was Wayne Millington who was temporarily residing with Joyce and Larry DeMary. Prior to the collision, Kenneth DeMary had all of the claimants sign contracts employing appellant attorneys Tunis and Loridans as well as promissory notes covering the advance they would receive. Following the collision appellant DeVille was dispatched to New Orleans with the promissory notes fully endorsed by the claimants, and Tunis and Loridans issued replacement checks. The six claimants were divided between appellants Dr. Morris and Dr. Perego and the claimants advised before the collision which physician they would see. Larry DeMary advised Millington that he was to use Dr. Morris as "it was Dr. Morris'

turn." Various mailings arising out of this staged collision provided the basis for Counts VII, VIII, IX and X of the indictment. Though Count VII was dismissed by the trial court for insufficient evidence, appellants Tunis, Loridans, Morris and Prudhomme were convicted of Counts VIII, IX and X. Additionally, of the twenty-two overt acts listed in Count XIII of the indictment, several arose from the staging of this June 29 collision. These were overt acts number 10 and 11 by Tunis, numbers 6, 8, 9 and 12 by Loridans, and number 22 by Prudhomme.

13. July 14, 1966—Sulfur, Louisiana

Organized by Larry DeMary, with the recruiting assistance of appellants DeVille and Trahan, this staged collision formed the basis of the mailing charged in Count VI of the indictment. Once again, one of the passengers was a woman in her eighth month of pregnancy. The passengers were informed prior to the collision by DeVille which doctors they should see. They were further instructed by DeVille to tell appellants Dr. Morris and Dr. Perego that "Larry sent me." Appellant attorney Shaheen again demanded a "kick-back" of the advances to the claimants. The advances were in the form of $500 loans to the claimants arranged by Shaheen at a local bank. Most of these funds were given to DeVille by the claimants for transmission to Larry DeMary and DeVille absconded with the funds. When learning of DeVille absconding with the bulk of the advance money, both Shaheen and Hennigan were fearful that DeVille would ultimately inform on them to the authorities. During the pendency of the claims, Shaheen received from Dr. Morris a medical report and bill concerning one of the claimants. He expressed dissatisfaction with the bill because it did not reflect sufficient numbers of treatments and patient visits. He had Joyce DeMary obtain a new bill from Dr. Morris reflecting additional visits. Appellants Shaheen, Morris, Perego and Tra-

han were convicted of Count VI of the indictment. Another defendant below, Nolan Breaux, who was named in Count VI of the indictment, was acquitted by the jury. Overt acts numbers 7 and 13 by Shaheen and number 19 by Trahan, as listed in Count XIII of the indictment, also were committed in furtherance of this staged collision.

*14. July 17, 1966—Luckey, Louisiana

This staged collision was organized by Kenneth DeMary with the recruiting assistance of appellant Alvin Evans, who also drove the "hitter" vehicle. Kenneth DeMary had the claimants sign contracts employing appellant attorneys Tunis and Loridans along with promissory notes to cover advances prior to the accident. The claimants were all referred to Dr. Parkman of Bossier City for treatment. The claimants did not see Tunis and Loridans to discuss any details of the collision until they were notified by these attorneys to come to New Orleans to pick up their settlement checks. When some of the claimants arrived in New Orleans, they told Tunis they wanted to withdraw and drop the case. Tunis, however, told them they had to take the money and keep their mouths shut.

15. July 27, 1966—Lake Charles, Louisiana

Organized by Larry DeMary, this staged collision differed from the usual in that the "hitter" struck the "target" vehicle broadside instead of in the rear-end. The advances were made to the claimants by attorney Nathan Cormie. Medical reports were transmitted to Cormie by appellant Dr. Perego on several of the claimants and incorporated in the claim made by Cormie on the insurance carrier. Appellant Dr. Morris also was consulted by some of the claimants. This collision formed the basis for Counts XI and XII of the indictment charging appellant Trahan with two mailings. Trahan was acquitted on both of these counts by the jury.

APPENDIX II

## STAGED COLLISIONS INCLUDED IN THE INDICTMENT

| DATE AND LOCATION | PARTICIPANTS | ATTORNEYS AND/OR PHYSICIANS INDICTED |
|---|---|---|
| 1. November 3, 1965 Bossier City | M. Perez L. DeMary K. DeMary C. Winn D. Magee S. Jefferson | E. Hamilton L. Hennigan |
| 2. January 4, 1966 Lake Charles | M. Perez F. Esthay W. Rutherford K. Fridell L. Noel N. Keating | L. Hennigan W. Morris, M.D. |
| 3. January 5, 1966 Lake Charles | Earl DeMary Elda DeMary F. Esthay M. Douget A. Rogers F. Rogers I. Courville L. Fontenot | L. Hennigan P. Shaheen W. Morris, M.D. |
| 4. January 6, 1966 Lake Charles | K. DeMary L. DeMary F. Esthay R. DeVille R. Prater B. Ardoin T. Filipski C. Daley W. Trahan J. Vital | K. Perego, M.D. W. Morris, M.D. |
| 5. March 10, 1966 Pineville | K. DeMary F. Esthay R. DeVille A. DeVille A. Evans F. Rider W. C. Spell W. Borsch | E. Hamilton L. Hennigan W. Morris, M.D. |

APPENDIX II—Continued

| DATE AND LOCATION | PARTICIPANTS | ATTORNEYS AND/OR PHYSICIANS INDICTED |
|---|---|---|
| 6. June 1, 1966 Lake Charles | L. DeMary D. DeMary A. Prudhomme R. DeVille L. Dummer B. Dummer E. George J. George | P. Shaheen W. Morris, M.D. |
| 7. June 29, 1966 Iowa | L. DeMary K. DeMary D. DeMary R. DeVille A. Prudhomme H. Breaux W. C. Spell W. Millington G. Pitts I. Pitts L. Reppond J. LeJeune | I. Tunis H. Loridans W. Morris, M.D. K. Perego, M.D. |
| 8., July 14, 1966 Sulphur | L. DeMary R. DeVille F. Esthay W. Trahan H. Roberts B. Ardoin R. Stutes G. Farque (Young) | P. Shaheen W. Morris, M.D. K. Perego, M.D. |
| 9. July 27, 1966 Lake Charles | L. DeMary W. Busby R. Busby B. Dummer L. Urdiales | W. Morris, M.D. K. Perego, M.D. |

APPENDIX III

THE FOLLOWING FIVE COLLISIONS, NOT MENTIONED IN
THE INDICTMENT, WERE BROUGHT OUT AT
TRIAL FOR SYSTEM AND INTENT

| DATE AND LOCATION | PARTICIPANTS | ATTORNEYS AND/OR PHYSICIANS |
|---|---|---|
| 1. December 29, 1965 Lake Charles | L. DeMary M. Perez D. DeMary O. Doucet J. Doucet | W. Morris, M.D. |

APPENDIX III—Continued

| DATE AND LOCATION | PARTICIPANTS | ATTORNEYS AND/OR PHYSICIANS |
|---|---|---|
| 2. February 17, 1966 Monroe | K. DeMary<br>A. Evans<br>Brockwell<br>E. Chriseol<br>A. Sweatt<br>R. Meek<br>R. Windhan<br>R. Clark<br>C. Tripp | L. Hennigan |
| 3. March 28, 1966 Shreveport | K. DeMary<br>A. Evans<br>C. Winn<br>W. Borsch<br>J. Sultan<br>J. Ezerneck<br>R. Gallagher<br>B. Knight<br>B. Young<br>L. Holbrook | I. Tunis<br>H. Loridans |
| 4. April 25, 1966 Lake Charles | K. DeMary<br>L. DeMary<br>D. DeMary<br>B. Farris<br>D. LeJeune<br>A. Meyers | I. Tunis<br>H. Loridans<br>W. Morris, M.D. |
| 5. May 25, 1966 Shreveport | K. DeMary<br>A. Evans<br>H. Lindsay<br>L. Woods<br>L. Paranuk<br>A. Guatney<br>L. Weaver<br>L. Feailer<br>J. Taylor | I. Tunis<br>H. Loridans<br>P. Shaheen<br>L. Hennigan |
| 6. July 17, 1966 Luckey | K. DeMary<br>A. Evans<br>H. Lindsay<br>J. Lindsay<br>L. Evans<br>S. Chapman<br>I. Brantley<br>L. Lindsay | I. Tunis<br>H. Loridans |

## APPENDIX IV

The following taken from the government brief is an accurate recapitulation of the events which transpired during the period between the return of the indictment on October 3, 1967 and the beginning of the trial on October 26, 1970:

On November 15, 1967, the defendants Borsch, Elda DeMary, Kenneth DeMary, Larry DeMary, DeVille, Hamilton, Hennigan, Loridans, Morris, Perego, Shaheen, Tunis and Winn, were arraigned in open court and entered pleas of not guilty. Each defendant was given thirty days to file special pleadings and the defendant, Shaheen, was given permission to leave the jurisdiction of the Court. On November 29, 1967, the defendants Breaux, Evans, Prudhomme and Trahan were arraigned and entered pleas of not guilty. At that time, the arraignment of Earl J. DeMary was again continued on motion of his attorney. On this date, the defendants Prudhomme and Trahan were granted thirty days to file special pleadings and the defendants Evans and Breaux were granted sixty days to do so.

In December of 1967 the defendant Philip J. Shaheen filed a motion for a speedy trial and hearing thereof was fixed for Wednesday, January 10, 1968. At the same time that he filed his motion for a speedy trial, Shaheen also filed motions for discovery and inspection, a motion for bill of particulars, motion for severance, motion for change in venue and motion to dismiss the indictment, all of which motions were also set for hearing on January 10, 1968.

On the same date that the defendant Shaheen filed the motions referred to above, the defendant, Roosevelt Prater, was arraigned and entered his plea of not guilty and was given sixty days in which to file special pleadings.

On December 18, 1967, Judge Edward J. Boyle, Sr., on motion of the United States, signed an order continuing the hearing on all of the defendant's (Shaheen) motions (which hearing had been set for January 10, 1968). The government's motion to continue was predicated on the fact that all of the other defendants had been given time in which to file pleadings and that the filing period had not yet expired. In an effort to conserve the time of the Court and to expeditiously handle the motions which the other defendants were sure to file, it was felt that the hearings should be continued until such time as all of the defendants had had an opportunity to place their motions before the Court.

The next motions to be filed were not long in coming. On December 15, 1967, the defendant, Charles Winn, filed motions for severance, particulars, discovery and inspection of government documents. On December 18, 1967, the defendant, Earl J. DeMary, filed motions for particulars, for change of venue, a motion to dismiss the indictment and motions for discovery and inspection.

On the same date, December 18, 1967, the defendant, Elda DeMary filed motions for discovery and inspections, motion to change venue, motion to dismiss the indictment, motion for bill of particulars. Larry DeMary on that same date also filed motion to change venue, to dismiss the indictment, for discovery and inspection and for particulars as did his brother, Kenneth Richard DeMary.

On December 26, 1967, the defendants DeVille, Prudhomme and Trahan filed motions to change venue, motions for severance, motions for discovery and inspection, motions for particulars, and motions to dismiss the indictment. In addition to which the defendant, DeVille, filed a motion to quash the indictment.

On February 28, 1968, the defendant, Nolan Breaux, filed a motion to sever the counts of the indictment and a separate motion to sever him from the other defendants for trial, a motion for discovery and inspection and a motion for particulars.

On May 1, 1968, the defendant, Morris, filed a motion to dismiss the indictment, a motion for severance of himself from other defendants for trial, a motion for special relief, that is, to adopt the pleadings of the other co-defendants, a motion for discovery and a motion to elect or alternatively to strike from the indictment certain counts as they related to him.

On May 9, 1968, an order was entered by Judge Boyle establishing Wednesday, June 12, 1968, as the date for the hearing for all motions for change of venue filed by all defendants. On June 10, 1968, the defendant Shaheen withdrew and abandoned his motion to change venue.

On June 12, 1968, hearing was had on the motion of the defendants Borsch, Elda DeMary, Earl DeMary, DeVille, Hennigan, Prater, Prudhomme, Shaheen, Trahan and Morris for change of venue and the matter was taken under advisement by the Court. On September 24, 1968, the decision denying all motions to change venue was entered by the Court.

On September 18, 1968, the defendant Prudhomme filed a motion for a speedy trial. On November 6, 1969, the defendant Prudhomme filed a motion for change of venue.

By order entered October 8, 1969, all pending unadjudicated defense motions were fixed for trial on November 11, 1969. On that date, November 11, 1969, the defendant, Shaheen, filed another motion for bill of particulars supplementing his original motion and also filed another motion to dismiss. On that same date, November 11, 1969, an indictment was returned in criminal number 18870 in the United States District Court for the Western District of Louisiana naming many of the same defendants in that suit, and arrest warrants were issued for some defendants.

On November 11, 1969, the hearing was held on all undecided defense motions and movers were given fifteen days to reply to the government's opposition after which the government was given fifteen days to reply to the defendants' response.

On November 28, 1969, the defendant, Winn, filed another motion for severance and one week later the defendant, Hennigan, adopted by reference all other defendants motions.

The government's response to all defendants motions to dismiss for lack of prosecution was entered on the 29th day of December, 1969, and issue was joined at that time. Approximately one month later, January 27, 1970, the government filed a surrebuttal to the defendant Shaheen's rebuttal in support of his motion to dismiss for lack of prosecution.

On February 27, 1970, an order was entered by Judge Boyle denying the motion to quash filed by the defendant, DeVille, and also denying the defendant Morris' motion to elect, the defendant Hennigan's motion to elect or strike, and denying all other motions to dismiss filed by all the defendants except the motions to dismiss grounded on the government's failure to prosecute which had been filed by Shaheen, Borsch, Prater, Prudhomme and adopted by the defendants, Morris and Hennigan. The trial court also took under advisement at that time that the motions by the defendants to dismiss on the grounds that the Grand Jury which returned the indictment was improperly constituted.

The Court further ruled on that day that all motions to dismiss for lack of prosecution as well as the motion to dismiss because of the improperly constituted Grand Jury, were to be tried in open court on March 19, 1970, and notices were issued accordingly.

On the date set for the hearing of all motions to dismiss for lack of prosecution, that is, March 19, 1970, the defendant Perego moved to have another attorney associated in his defense. Also on

that day, March 19, 1970, the defendants, Elda DeMary and Earl DeMary, moved that their attorney, R. Newman, be allowed to withdraw as counsel of record. On that same day, March 19, 1970, the Court received and filed into the record a letter from John Stevens, attorney at law, asking to be named attorney of record for the defendant Winn.

Thus, on the very day that all motions to dismiss for lack of prosecution were to be heard, two new attorneys, George Leppert for the defendant Perego, and John Stevens for the defendant Winn, entered the case. On that same day, the defendants, Earl and Elda DeMary had their counsel, R. E. Newman, withdraw from the case. As a consequence, only those motions which could still be heard without prejudicing the rights of the defendants to be adequately represented by counsel were heard on the March 19th date. As a result of that hearing, motions by the defendants, Shaheen, Borsch, Prater, Prudhomme and Hennigan, to dismiss for lack of prosecution were taken under submission. Motions by the defendants, Borsch and Prater, to dismiss because the Grand Jury was improperly constituted were denied as were the motions of Borsch and Prater to suppress certain evidence.

In May of 1970, the defense counsel were still withdrawing from the case. On the 6th of May, Jack Rogers removed himself from the case as attorney for the defendant, Trahan. He also removed himself from the case as attorney for Prudhomme. Robert Kleinpeter, on the 6th of May, 1970, withdrew from the case as counsel for the defendant, Lloyd Hennigan. On May 15, 1970, Jack Rogers withdrew from the case as attorney of record for the defendant, DeVille.

In addition to the withdrawal of counsel referred to above, many new counsel entered the case. On May 14, 1970, Francis G. Weller was appointed by the Court to represent the defendant, Evans. On the same date the Court appointed Peter E. Duffy to represent the defendant, Trahan, and on the 20th of the month, Jeffrey Schwartz was appointed to represent the defendant, Evans, since attorney Francis Weller indicated that he could not accept the appointment.

Also on May 20, 1970, a hearing was had to determine the counsel for M. Perez, Elda DeMary and Earl DeMary, it appearing that they were unrepresented to that point. As a result of the hearing, the Court appointed James Keenan to represent the defendant M. Perez, and Robert Glass to represent Elda DeMary. The hearing to determine counsel for Earl DeMary was continued without date due to the illness of the defendant.

On the 25th of June, 1970, Robert Glass who had been appointed to represent the defendant, Elda DeMary, withdrew from the case. On that same date, Jeffrey Schwartz, attorney who had been appointed to represent the defendant, Evans, also withdrew from the case as did James Keenan who had been appointed to represent the defendant, Perez. One day later the appointment of Peter E. Duffy as attorney to represent Trahan was recalled and set aside and Douglas Clup was appointed to represent Trahan. On the same day, Erwin Sanders was appointed to represent the defendant, Elda DeMary, and James Mulla was appointed to represent Mayo Perez.

In June of 1970, the final trial date, that is, October 26, 1970, was set. But even after the setting of the trial date, new attorneys entered the case. Edward M. Baldwin entered the case as attorney for the defendant, Shaheen, on September 3, 1970, and later Milton Masinter was appointed to represent the defendant, Breaux. Norman Prendergast, who had been in the case as attorney for the defendant, Breaux, had been allowed to withdraw on the 19th day of October, 1970, because Mr. Prendergast had recently become attorney for the Small Business Administration and as such it was felt that a conflict of interests would be avoided by allowing him to step out of the case.

Because of the complexity of the case, the number of defendants and the anticipated length of the trial, it was necessary to set a trial date sufficiently far in advance to allow all attorneys to clear their calendars for the duration. When October 26th was finally set as the date that the trial would begin, the Court also set several pre-trial conferences where all attorneys were present to discuss the conduct of the trial, to establish guidelines of procedure to be followed and to provide ample time for discovery of all government documents to be used during the course of the prosecution. One such pre-trial was held on September 10, 1970, and the last pre-trial preceding the actual beginning of the government's case was set for October 19, 1970, and was held on that date.

## APPENDIX V

The sentences imposed by the District Court for the counts of the indictment under which each appellant was convicted below were as follows:

| Appellant | Counts of Indictment | Sentence |
|---|---|---|
| Mayo Perez | 13 | 2 years |
| William R. Trahan | * 13 | 1 year |
| | 6 | 1 year |
| Andrew L. Prudhomme | * 13 | 2 years |
| | 8 | 2 years |
| | 9 | 2 years |
| | 10 | 2 years |
| Ernest C. Hamilton | 13 | 3 years |
| Alvin Evans | 13 | 2 years |
| Robert L. DeVille | 13 | 3 years |
| Dr. Kenneth L. Perego | * 13 | 3 years |
| | 6 | 3 years |
| Lloyd E. Hennigan, Jr. | 13 | 3 years |
| Henri Loridans | * 13 | 3 years |
| | 8 | 3 years |
| | 9 | 3 years |
| | 10 | 3 years |
| Philip J. Shaheen | * 13 | 3 years |
| | 5 | 3 years |
| | 6 | 3 years |
| Irwin L. Tunis | * 13 | 3 years |
| | 8 | 3 years |
| | 9 | 3 years |
| | 10 | 3 years |
| Dr. Wilson Morris | * 13 | 3 years |
| | 5 | 3 years |
| | 6 | 3 years |
| | 8 | 3 years |
| | 9 | 3 years |
| | 7 | 3 years |

* Sentences on substantive counts to be served concurrently with the conspiracy count.